```
 1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF PENNSYLVANIA
 2

 3    RICHARD ROE and            :  Case No. 2:21-cv-02655-AB
      KATHERINE JINES, ET AL,    :  Case No. 2-21-cv-00346-AB
 4                               :
                Plaintiffs       :
 5                               :
         v.                      :  Philadelphia, Pennsylvania
 6                               :
      DEVEREAUX ADVANCED         :  December 17, 2021
 7    BEHAVIORAL HEALTH, et al   :
                                 :
 8          Defendants.          :  10:50 a.m.-12:09 p.m.
      . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 9
                    TRANSCRIPT OF ORAL ARGUMENT
10            BEFORE THE HONORABLE ANITA B. BRODY,
                UNITED STATES DISTRICT COURT JUDGE
11

12    APPEARANCES:

13    For the Plaintiffs:        ANNIKA K. MARTIN, ESQ.
                                 JESSICA MOLDOVAN, ESQ.
14                               LIEFF CARBRASER HEIMANN &
                                  BERNSTEIN LLP
15                               250 Hudson Street
                                 8th Floor
16                               New York, NY  10013

17                               JOSEPH B. KENNEY, ESQ.
                                 SAUDER SCHELKOPF, LLC
18                               1109 Lancaster Avenue
                                 Berwyn, PA  19312
19
      For the Defendants:        CAMERON M. REDFERN, ESQ.
20                               JEFFREY A. LUTSKY, ESQ.
                                 STRADLEY RONON STEVENS &
21                                YOUNG, LLP
                                 2005 Market Street
22                               Philadelphia, PA  19103

23    Court Recorder:            J. WALTON
                                 Clerk's Office
24                               U.S. District Court

25
```

```
1    Transcription Service:    Hunt Reporting Company
                               12 Crain Hwy. N #2
2                              Glen Burnie, MD 21061

3

4
     Proceedings recorded by electronic sound recording,
5    transcript produced by computer-aided transcription
     service.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2
     ARGUMENT                                              PAGE
3
     By Ms. Moldovan                                      7
4
     By Mr. Lutsky                                        9
5
     By Ms. Moldovan                                     17
6
     By Mr. Lutsky                                       21
7
     By Ms. Moldovan                                     21
8
     By Mr. Lutsky                                       22
9
     By Ms. Moldovan                                     24
10
     By Mr. Lutsky                                       26
11
     By Ms. Moldovan                                     28
12
     By Mr. Lutsky                                       31
13
     By Ms. Moldovan                                     36
14
     By Ms. Lutsky                                       40
15
     By Ms. Moldovan                                     44
16
     By Mr. Lutsky                                       45
17
     By Ms. Martin                                       54
18
     By Mr. Lutsky                                       58
19
     By Ms. Martin                                       61
20
     By Mr. Lutsky                                       63
21
     By Ms. Moldovan                                     65
22
     By Mr. Lutsky                                       65
23

24

25

```
 1                  P R O C E E D I N G S
 2              THE COURT:  All right.  Now, would you like to
 3     introduce, Mr. Kenney, who you're representing?
 4              MS. MOLDOVAN:  Good morning, Your Honor,
 5     representing plaintiffs.
 6              THE COURT:  Okay.  Annika Martin.
 7              MS. MARTIN:  Good morning, Your Honor.
 8              THE COURT:  And Jessica Moldovan.
 9              MS. MOLDOVAN:  Good morning, Your Honor.
10              THE COURT:  And Jeffrey Lutsky.
11              MR. LUTSKY:  Good morning, Your Honor.
12              THE COURT:  And Cameron Redfern.
13              MS. REDFERN:  Good morning, Your Honor.
14              THE COURT:  Okay.  Some of you are from
15     Nashville?
16              MS. REDFERN:  Our Nashville partner was not able
17     to make it because of the sudden change, Mark Ellis, but
18     Jessica and I are from New York.
19              THE COURT:  Oh, okay.  I'll allow you to stay
20     anyway.
21              MS. REDFERN:  Oh, thank you.  I appreciate that,
22     Your Honor.
23              MR. KENNEY:  Your Honor, two associates from my
24     firm might be attending as well, Mr. --
25              THE COURT:  Well, where are they?
```

```
1              MR. KENNEY:  They should be here by now.
2              THE COURT:  Oh, okay.  Oh, I should -- do you
3      want me to wait until --
4              MR. KENNEY:  No, it's okay, but just if they
5      walk in.
6              THE COURT:  No, I just wanted -- I just -- and
7      you're all from New York?
8              MR. KENNEY:  I'm from Philadelphia.
9              THE COURT:  And you are?
10             MR. KENNEY:  Joe Kenney, Your Honor.
11             THE COURT:  Okay.  And what firm are you from?
12             MR. KENNEY:  Sauder Schelkopf.
13             THE COURT:  What?
14             MR. KENNEY:  Sauder Schelkopf.
15             THE COURT:  Okay.  All right.  It doesn't make
16     any difference, and you are from where, Mr. Lutsky?
17             MS. LUTSKY:  Your Honor, Stradley Ronon.
18             THE COURT:  Oh, okay.  All right.  Okay.
19             I usually reveal that my -- if you're from
20     Nashville because my family is from Nashville, part of my
21     family and my brother teaches at the Vanderbilt Law School
22     and my sister-in-law is the solicitor general of the
23     state, so --
24             MS. LUTSKY:  I'll let our Nashville partner
25     know.
```

```
 1                 THE COURT:  What?

 2                 MS. LUTSKY:  I'll let our national partner know.

 3                 THE COURT:  Okay.  I mean, you know, so I just

 4       always reveal it because people know that they're so

 5       active in the legal community there.

 6                 MS. LUTSKY:  Absolutely.

 7                 THE COURT:  And not as practicing lawyers, but

 8       in some kind of official capacity, well I guess a

 9       professor, yeah, it's an official capacity.

10                 Okay.  All right.  The first issue we will -- I

11       want to address Roe first.  I think that that makes sense

12       to me and let me -- I know that it's your motions to

13       dismiss.  At the same time I like to hear about what

14       plaintiff has to say about their case.  So I'm going to

15       let you start to argue you call vicarious liability or

16       they call vicarious liability.  Would you like to tell me

17       what your -- what the facts are in your case that they

18       address in vicarious liability and then I'll understand

19       their argument better.

20                 Okay.  Who's going to argue it?

21                 MS. MOLDOVAN:  I am.

22                 THE COURT:  Okay.  Ms. Moldovan.

23                 MS. MOLDOVAN:  Would you like me to --

24                 THE COURT:  I don't care, whichever is more

25       comfortable for you.  I think -- that's fine.  Can -- just
```

1    as long as I can hear you, if I can't hear you, I'll have

2    to have you come up.

3            MS. MOLDOVAN:  Oh, I can come up, Your Honor.

4            THE COURT:  Okay.

5            MS. MOLDOVAN:  Good morning, Your Honor.

6            THE COURT:  Good morning.

7            MS. MOLDOVAN:  So this case is about an

8    institution that's supposed to care for the most

9    vulnerable members of our society, who has autism,

10   intellectual and developmental disabilities and special

11   need (indiscernible), but Devereaux has repeatedly failed

12   to do so.

13           As a result of that failure, my clients and the

14   thousands of children currently in Devereaux custody has

15   suffered unspeakable harms.  They have been raped,

16   sexually assaulted, physically and emotionally abused.

17   The (indiscernible) and drugged.  Many were explicitly

18   told to keep quiet and (indiscernible) communicating with

19   the outside world the plaintiffs (indiscernible) Rosey

20   (ph) and Deborah Stack (ph) and Devereaux did not

21   adequately pay, supervise or train.

22           So turning directly to the vicarious liability -

23   -

24           THE COURT:  Well, let them -- I just want to

25   know the facts from you that you believe are being

1   addressed by the viability motion.  I mean, I'm sorry, the

2   vicarious liability motion.  I'm going to let the

3   defendant tell me about their motion.

4          MS. MOLDOVAN:  Sure.  In terms of the facts,

5   Your Honor, that we think are relevant particularly for

6   vicarious liability --

7          THE COURT:  Well, yes, go on.

8          MS. MOLDOVAN:  -- so --

9          THE COURT:  Well, first I have to find out --

10  I'll let you come back.

11         MS. MOLDOVAN:  Okay.

12         THE COURT:  I'm going to make believe this is in

13  chambers, because I have to -- this helps me understand

14  the argument better, and that's what I think all of you

15  care about is that I understand it.  So I'm going to ask

16  you to sit down and then I'm going to hear the vicarious -

17  - why he believes there's vicarious -- well, you can

18  start.  All right.

19         MS. MOLDOVAN:  Sure.  So just to give you more

20  of the facts, Your Honor.

21         THE COURT:  Okay.

22         MS. MOLDOVAN:  So we're representing ten

23  plaintiffs in addition to (indiscernible) and then one

24  plaintiff Roe on top of the class.  And for all of these

25  plaintiffs they were either physically, emotionally or

1    sexually abused and they left Devereaux worse than when

2    they went there, and continue to suffer from the trauma of

3    their experiences to this day.

4          So to be clear and particularly relevant to the

5    vicarious liability analysis, this is not a case about a

6    few bad apples who committed a few bad acts.  This is

7    about institutional failure and a culture of systemic

8    abuse and neglect.

9          The actions that Devereaux took came from the

10   top.  They centralized (indiscernible) they centralized

11   decision-making system, qualities that affect all of the

12   various facilities and the employees there took their

13   charge from the top and they -- Devereaux was home,

14   school, doctor, teacher.  Devereaux did everything for

15   these kids, and Devereaux had a responsibility to care for

16   these individuals, care for these kids, teach them, clothe

17   them, refer medicine and give medicine, restrain them,

18   discipline.  All of this is in the confines of what

19   individuals at Deveraux were supposed to do for the people

20   in their care.

21          THE COURT:  Okay.  Thank you very much.  All

22   right.  Mr. Lutsky, I know understand what the plaintiffs

23   are alleging and you can argue against that.

24          MR. LUTSKY:  Thank you, Your Honor.  Would you

25   prefer we keep the mask on, is that your preference?

```
 1              THE COURT:  Yes.

 2              MR. LUTSKY:  Okay.  That's fine.

 3              THE COURT:  I really believe that there is a

 4    pandemic.

 5              MR. LUTSKY:  Okay.  Well, regard to the facts

 6    first before I address the legal insufficiency --

 7              THE COURT:  And just as long as I hear you

 8    that's all that matters and I hear you very clearly.

 9              MR. LUTSKY:  Okay.  With regard to the facts

10    first before we get to the legal insufficiency of the

11    vicarious liability --

12              THE COURT:  Yes.

13              MR. LUTSKY:  -- let me just say, Your Honor said

14    she wanted to talk about Roe.  What I heard was that she

15    represents individuals that have been raped or abused.

16    She makes very clear in her Roe complaint, which is what I

17    understand we're talking about first, that there is no

18    actual injury being alleged by class.  There's only a risk

19    of heightened injury that she believes has harmed an in

20    class member.  There is no actual injury being alleged by

21    class members in Roe.

22              Now, in Jines, there are individual plaintiffs

23    with actual injuries they're alleging.  But I just wanted

24    to make that differentiation for the Court with regard to

25    her factual presentation on what this is about.
```

 1            With regard to the vicarious liability claims
 2    let me also observe another fact for you, just so we have
 3    this in context.  Devereaux is a very large organization.
 4    It services about 25,000 individuals a year.  They have
 5    very different needs medically, psychologically, very
 6    different social behavioral needs and operate in 13
 7    states.
 8            Because of the very different needs that their
 9    population presents, they have everything from residential
10    treatment centers to group homes, psychiatric hospitals to
11    community living groups, to out patient programs.  Some
12    people don't live at Devereaux at all, they just receive
13    their therapy for social (indiscernible) needs on an out
14    patient basis.  So it's a very large organization.
15            It's been there almost a hundred years.  I
16    wouldn't say served 25,000 individuals a hundred years
17    ago, but you do the math, there have been millions of
18    people that have been serviced by Devereaux.
19            So to the extent that there is a presentation
20    being made about the large member of the (indiscernible),
21    I just wanted the Court to keep in mind the large
22    population that services through 6, 7,000 employees across
23    the country.
24            Now, with regards specifically to the vicarious
25    liability claims.  In both cases, but talking about Roe,

```
 1   the plaintiffs seek to hold Devereaux liable vicariously

 2   for assault and battery.  And in almost every case, by an

 3   unknown staff person, they don't allege who the

 4   perpetrator is, they have an unnamed (indiscernible) --

 5   and these are staff people.

 6           With regard to the assault and battery claims

 7   specifically it's Count VI in Roe and Count XVI in Jines.

 8   And Pennsylvania and almost all the states they list where

 9   these individuals in Jines reside (indiscernible) when

10   they were serviced by Devereaux and where their class

11   members may reside follow the traditional restatement

12   analysis test for vicarious liability.

13           Which is, in order to be liable --

14           THE COURT:  One second.  I have that.  Do we

15   have that?  I have that back in the chambers.  You don't

16   have a copy of that here, do you?  The restatement.  All

17   right.  I have one in my book.  Just one second.  I don't

18   --

19           THE CLERK:  Page 8 at the (indiscernible).

20           THE COURT:  Page 8, okay.  No, okay, all right.

21   Okay.  Because Pennsylvania -- certainly Pennsylvania

22   restatement is various -- is very --

23           MR. LUTSKY:  Exactly.  And the test in

24   Pennsylvania which is very, very common in these other

25   states, which are also impacted here is that in order to
```

1   be vicariously liable, the abuse has to occur within the

2   course and scope, it's and, and scope of employment.

3          And the issue is scope of employment.  And

4   Pennsylvania courts have consistently held that sexual and

5   physical abuse of minors are so horrific, so outrageous,

6   in violation of various criminal statutes and

7   (indiscernible) certainly in violation of Deveraux's

8   policies.

9          THE COURT:  Well, the plaintiff didn't only

10   allege sexual issues.

11          MR. LUTSKY:  Well, most of their -- I would say

12   in Jines, there are 11 plaintiffs and some of them raise

13   sexual issues, some physical and some both.  And in the

14   class action while the representative Roe alleges physical

15   abuse, the class is on behalf of both --

16          THE COURT:  Well, we're not up to the class yet.

17          MR. LUTSKY:  Okay.

18          THE COURT:  Right now we're only up to Roe, so

19   let's argue to me on Roe.

20          MR. LUTSKY:  So the question about abuse is, was

21   it done during the scope of the employment of the abuser.

22   And Pennsylvania courts have consistently held that

23   particular abuse of minors is not in the course and scope

24   of employment because it's so outrageous, because it could

25   not have been done for the benefit of the employer.  It

1    was done for the personal gratification of the employee.

2              And Your Honor reached this exact same result in

3    the (indiscernible) case, which I personally

4    (indiscernible) case --

5              THE COURT:  Well, that was a little different.

6              MR. LUTSKY:  Well, it was a sexual abuse case,

7    but you went through in that opinion very carefully all of

8    the authorities regarding scope of employment with regard

9    to abuse of minors.

10             THE COURT:  But that was against Penn State,

11   wasn't it?

12             MR. LUTSKY:  Yes, it was.

13             THE COURT:  And so he didn't work for Penn.

14   This was not in the context of Penn State, was it?

15             MR. LUTSKY:  He didn't work for Penn State, but

16   the abuse occurred there and it was alleged --

17             THE COURT:  Well --

18             MR. LUTSKY:  -- that Penn State facilitated that

19   because it permitted him to bring minors into the area.

20             THE COURT:  Yeah, but this has nothing to do

21   with this.  This is actually people who are -- work for

22   Deveraux and in the context of Devereaux.

23             MR. LUTSKY:  Yes, but there are many, many other

24   faces in Your Honor's opinion in that Doe case,

25   (indiscernible) authorities failed to care for.  For

1    example, the <u>BM versus Northeast</u> (ph) --

2              THE COURT:  You're expecting me to be

3    consistent, is that what you're saying?

4              MR. LUTSKY:  It would be appreciated if it were

5    to happen.  And, in fact, the decision that you reached

6    there it is a very careful decision, despite the issue

7    (indiscernible) it goes over the cases very carefully.

8              There are many cases we have cited in our brief,

9    literally dozens in which courts have said that abuse of

10   minors is not done for the employer's benefit, so

11   therefore, it cannot be within the scope of employment.

12             For example, we cite to the <u>BM versus</u>

13   <u>Northeastern Educational Unit</u> which was a case about

14   educational institution in the Middle District of

15   Pennsylvania.  In Pennsylvania, we cite the <u>Sanchez v</u>

16   <u>Lochness</u> (ph) which is a daycare abuse of minors on

17   premises.  There are a number of clergy cases we cited to

18   as well.

19             THE COURT:  That's the -- those are the cases

20   that come to mind.

21             MR. LUTSKY:  Yes, and there's a litany of them.

22   And Pennsylvania has always adopted scope of employment,

23   course and scope (indiscernible) agency and has

24   consistently held the abuse of minors is not done in

25   furtherance of the employer's business and therefore falls

1    outside as a matter of law, not as a matter of fact, but

2    as a matter of law, falls outside the course and scope of

3    employment.

4           Now, the primary response from plaintiff on this

5    --

6           THE COURT:  Well, I'll let them come back and

7    you don't have to tell me what their -- I'll let you go

8    back and forth because that's most important to me.

9           MR. LUTSKY:  Okay.  What I was going to

10   interject and then, Your Honor, whatever you decide is

11   fine, they urge two different --

12          THE COURT:  I don't want you to argue for them.

13          MR. LUTSKY:  Okay.

14          THE COURT:  So I want to hear what they have to

15   say and then you can come back and argue against it, I

16   have no problem with that.

17          MR. LUTSKY:  Okay.  All right.  Well, like I

18   said we urge the Court to follow the consistent practice

19   in Pennsylvania on the state's for course and scope of

20   employment under matter of law.

21          THE COURT:  All right.  I'm just going to let

22   you do -- and then I'm going to ask plaintiff come back

23   and argue against your contentions as to vicarious

24   liability, that's -- if you were in chambers, I would just

25   go back and forth but we're not.

```
1               MR. LUTSKY:  Sure.

2               THE COURT:  Okay?  All right.  Would you like to

3     argue?

4               MS. MOLDOVAN:  Yes, Your Honor.

5               THE COURT:  Well, the impact, basically the

6     impact of the restatement.

7               MS. MOLDOVAN:  Sure, Your Honor.  We offered

8     three different theories of liability.  We have the

9     (indiscernible) probation, the traditional scope of

10    employment (indiscernible) aid of an agency.

11              Regardless of which approaching take, so say

12    it's the scope of employment, facts matter.  That's

13    exactly what our colleague (indiscernible) but there are

14    cases that show that sometimes the actions are within the

15    scope of the employment and cases where there are not.

16    That's precisely why there are (indiscernible) cases for

17    example that come out in opposite ways.  And you can be

18    completely consistent with respect to John Doe 6, the Penn

19    State (indiscernible) case.

20              In that case, there was no connection, as he

21    says, Your Honor, between Penn State and the abuse that

22    occurred.  So --

23              THE COURT:  Why is that material in the context

24    of vicarious liability?  Why is that essential in the case

25    of vicarious liability, in the context of the restatement?
```

1          MS. MOLDOVAN:  Right, because vicarious

2    liability is ultimately about when it is appropriate to

3    hold the employer liable for what the employee does.  And

4    in that case, there has to be a connection between the

5    (indiscernible) and the harm.

6          In the case of John Doe 6 v Penn State that

7    connection did not exist.  But you have (indiscernible) he

8    could have taken, unfortunately, could have taken John Doe

9    6 anywhere to perpetrate the abuse.  He happened to take

10   John Doe 6 to Penn State.

11         The other (indiscernible) when he did that, he

12   wasn't -- John Doe 6 lived there, that's not true of the

13   people at Devereaux.  The kids at Devereaux live there,

14   they depend on the people there to prescribe them

15   medication, to teach them.  It's a completely different

16   case.

17         THE COURT:  Well, why is it important that it's

18   a different case?  I mean, in what way -- I mean, I know

19   what I wrote in Roe -- I mean in Sandusky, but why is it

20   material to this -- to your analysis of vicarious

21   liability that this person is not -- that Sandusky was not

22   working for Penn State, why does it matter?

23         MS. MOLDOVAN:  Because it could not be within

24   the scope of his employment, if he wasn't actually working

25   there.

1              THE COURT:  Okay.

2              MS. MOLDOVAN:  And that's not the case for all

3    the perpetrators in our case.  They were working for

4    Devereaux.  They were -- and when they were perpetrating

5    abuses, they were acting in their capacity as Devereaux

6    staff.  That's a key difference between these two cases.

7              Another difference is the fact that the kids at

8    Devereaux are captive at Devereaux.  They live there, they

9    sleep there, they get their education there, they get

10   their medication there.  Again, that's not the case with

11   John Doe 6, that's not the case in the daycare context,

12   that's not the case in a church context even.

13             This is a particular institutional case and in

14   that way, it's separate from many of the other vicarious

15   liability cases.

16             THE COURT:  And under the jurisprudence of

17   vicarious liability why is that material?  In other words,

18   what does -- does vicarious -- the Pennsylvania view of

19   vicarious liability, why does it matter and what is the

20   essence of that doctrine in -- relating to this case?

21             MS. MOLDOVAN:  The essence of that doctrine is

22   when is it appropriate to hold the employer liable for the

23   employees' actions.  That's fundamentally what vicarious

24   liability does that.

25             Now, if -- it definitely takes the place -- the

1    time and place occurs at Devereaux.  Defendants do not

2    dispute that.  What they go after is whether it's within

3    the scope of the employment.  And whether or not something

4    is within the scope of the employment is whether or not

5    the person is acting in their capacity, in their job, as

6    they perpetrate the abuse in the context of doing their

7    job, and that's precisely what happened.

8            For someone at Devereaux to take (indiscernible)

9    to restrain someone to the point where they get bruises

10   and they're injured, the restraining is part of the job.

11   It's just like a case of excessive force.  A police person

12   can use force, but they can't use excessive force.  And

13   once they use excessive force, they're acting within the

14   scope of their job, they just exceeded their authority and

15   perpetrated abuse.

16           THE COURT:  Okay.

17           MS. MOLDOVAN:  The main thing to take away, but

18   facts matter in this situation and the fact that Deveraux

19   are such that they were acting within the scope of their

20   job when they perpetrated the various types of abuse.

21           THE COURT:  Okay.  All right.  Thank you.

22           Let me see, do you have anything to respond, or

23   should I take everything that was said and simply weigh it

24   myself.  Thank you.

25           Is there anything on vicarious liability that

1   you wish to address that you haven't addressed before?

2          MR. LUTSKY:  The only thing I would say is what

3   was left out of that discussion, which is an essential

4   element of vicarious liability is that they

5   (indiscernible) has to be done to further the employer's

6   business.  It is not done for personal gratification of

7   the employee, it has to be done to further the employer's

8   interest.  And here --

9          THE COURT:  In other words, if it doesn't

10  further the employer's interest, it could never be -- it

11  can never be --

12         MR. LUTSKY:  That's correct.

13         THE COURT:  Is that your position?

14         MR. LUTSKY:  That's correct.

15         THE COURT:  Okay.  All right.  I just want to

16  know if that's your position.  Do you believe that that's

17  accurate?

18         MS. MOLDOVAN:  No, Your Honor, it's not.

19         THE COURT:  Okay.  I'll weigh that.

20         MS. MOLDOVAN:  And if I could just add one final

21  thing on vicarious liability.  In order for us to

22  understand the full scope of the employee's jobs, we need

23  discovery.  We're at the pleading stage.  We understand

24  that -- as I said, there were teacher, doctor, you know,

25  parents, but to understand precisely what happened just

1    like in the <u>Barry</u> (ph) case, which is a Pennsylvania case,

2    we need to know exactly what it was (indiscernible) and we

3    can get that with discovery.

4            THE COURT:  Well, that also would be an argument

5    on Jines.

6            MS. MOLDOVAN:  Yes.  Yes, Your Honor.

7            MR. LUTSKY:  Your Honor, I'll read from your own

8    opinion.  And I'm not arguing that the facts are exactly

9    the same, but your analysis of vicarious liability doesn't

10   differ case-to-case.  And we --

11           THE COURT:  But I may have gotten smarter in the

12   last couple of years, I don't --

13           MR. LUTSKY:  You're brilliant here, Judge.  You

14   were brilliant (indiscernible) which is restatement

15   (indiscernible) 228.  So we're quoting the restatement.

16           THE COURT:  Okay.  I can read that, yeah.

17           MR. LUTSKY:  And the restatement says, conduct

18   of a servant is not within the scope of employment if it

19   is different in kind from that authorized, far beyond the

20   authorized time and space limits are too little actuated

21   by a purpose to serve a master.

22           And what these cases consistently hold is,

23   people that abuse minors are not acting in the furtherance

24   of the employer's interest.  It violates the law.  It

25   violates the employer's policies, it's completely contrary

1    to interest and that's why these cases consistently hold

2    and we've cited dozens of them.

3             THE COURT:  What year was that case, I don't

4    remember?

5             MR. LUTSKY:  It was 2013.

6             THE COURT:  Okay.

7             MR. LUTSKY:  The law has not changed in

8    Pennsylvania.

9             THE COURT:  All right.  Thank you.  You know,

10   there are sometimes I find I was wrong.

11            Okay.  The next issue is assault and battery.

12   Do you want to explain what these -- well, let -- I'm

13   going to ask you to argue about assault and battery in

14   Roe.

15            MR. LUTSKY:  In Roe, okay.

16            THE COURT:  Or Jines, they're both the same.

17            MR. LUTSKY:  Well, in both cases the assault and

18   battery is presented in the complaint.  And in both cases

19   it should be dismissed.

20            We pointed out in our motion to dismiss that a

21   battery requires an offensive touching.  If you haven't

22   touched a person, you haven't committed a battery.  Now,

23   obviously Devereaux as a foundation, a non-profit

24   foundation it doesn't touch anybody.

25            Here, they want to hold Deveraux liable for the

1    battery committed by the employees.  One argument they

2    raise is vicarious liability, which we already talked

3    about, but they also raised an argument in response to our

4    motion which I don't believe is pled anywhere in the

5    complaint, but in response to the motion they argue that

6    there also is direct liability for battery.

7             THE COURT:  Let me -- well, I'm going to let

8    them argue their own case.  So I don't want to hear you

9    telling me what they argue.  Let me hear from them and

10   then I'm going to let you come back.

11            Okay.  All right.  Why don't you tell me what

12   you believe that you have a claim for assault and battery

13   that should survive?

14            MS. MOLDOVAN:  So we've alleged that Devereaux

15   created a culture of prominent abuse where kids were

16   either abused or waiting in fear for the next time that

17   they would be abused.

18            Contrary to what the defense has argued, battery

19   -- all that is necessary for battery is that the actor

20   intent to cause the other directly or indirectly to come

21   in contact with a form and substance in that manner which

22   would reasonably regard as offensive.

23            And that is exactly what Devereaux did by

24   virtually not putting policies in place to protect the

25   students and kids in their care.

1            So to commit assault and battery, an institution

2    does not need to physically touch anyone, nor do they have

3    to desire to do harm.  That's a misunderstanding of the

4    definition of battery.

5            Sure, that's often what happens when you think

6    of battery, someone touches someone else, but that's

7    actually not -- not what is actually required under the

8    law for a battery.

9            To not appropriate train, pay or supervise its

10    employees and by knowingly failing to implement policies

11    Devereaux all but guaranteed that abuse would occur and

12    that's what intent -- that is tantamount to intent under

13    the law.

14            For (indiscernible) -- to (indiscernible) a

15    legal person would know that based on the circumstances

16    abuse is substantially certain to occur.  That is what

17    Devereaux did by placing the kids in the position that

18    they did.

19            So, Your Honor, we pled facts that give rise to

20    battery, to assault and battery.  That's what we have to

21    do in our complaint.  So to the extent that defendants say

22    we haven't pled this theory of liability, all we have to

23    do is plead the fact that gave rise to this legal claim

24    and that's what we have done.

25            So again, we understand that an institution did

1    not punch any of the kids.  We know, you know, how things

2    work.  We're saying the position that --

3              THE COURT:  You're saving derivative -- what

4    you're saying is derivative assault, if you will; is that

5    correct?

6              MS. MOLDOVAN:  Exactly.  And the people who did

7    the drugging, we're not bringing it against the

8    perpetrators, we're bringing it against the institution

9    that engages in that type of behavior, that has its

10   employees essentially drug kids into a stupor.  And there

11   are cases that support that.

12             So we have the Bardelodi v Gracepoint (ph) case

13   where a motion to dismiss was denied, where the plaintiffs

14   sued a hospital for battery on the basis that she was

15   medicated against her will.  That was not against the

16   individual that gave her the medication.  That case was

17   against the institution where that occurred.

18             Same thing in Freder v Iolaff (ph).  Again, this

19   is where the institution places someone in a position to

20   come into an event of contract.  They don't have to be the

21   ones that actually (indiscernible).

22             THE COURT:  Okay.  Thank you.  Okay.  Mr.

23   Lutsky.

24             MR. LUTSKY:  Thank you, Your Honor.  We are in

25   disagreement on what assault and battery is.  Assault and

1   battery requires, and we cited many cases on this in our

2   brief.  Two elements, there has to be an offensive

3   touching and secondly, there has to be an intent to harm.

4           THE COURT:  It's not an assault also, it has to

5   be a touching?

6           MR. LUTSKY:  No, assault and battery.  You

7   cannot battery by omission.  That's not a claim.  That

8   doesn't exist, that's what they're arguing, because we

9   didn't have a policy somebody was battered, therefore we

10  battered them.  That doesn't make any sense.

11          In fact, there is cases cited in our brief, the

12  Solomon case in Florida, the Forth v McCracken (ph) case

13  in the Eastern District, you have to have an offensive

14  touching.  You can't have assault and battery by omission.

15          So the basic elements of the claim are not met.

16  And there's no argument here that Devereaux intended any

17  harm to the plaintiff in either of the cases.  So the

18  assault and battery cases should be dismissed as a matter

19  of (indiscernible).

20          THE COURT:  Okay.  Thank you.  All right.  The

21  third, intentional infliction of emotional distress and

22  that is Title 9; is that correct?

23          MS. MOLDOVAN:  We have two claims, the Title 9

24  claim and the separate intentional --

25          THE COURT:  Yeah, well, that's right.  Why don't

1    you all give it to me.  I mean, why don't you tell me what

2    the facts are, I'm sorry.

3           MS. MOLDOVAN:  Regarding (indiscernible)?

4           THE COURT:  I don't care.

5           MS. MOLDOVAN:  So, yeah, I'll start with the

6    Title 9.  So, Your Honor, might be more familiar with the

7    -- there are two type of claims, two type of Title 9

8    claim.  There's pre-assault and post assault claims.

9           The traditional more type of common of Title 9

10   claim is a post assault claim.  That is not the type of

11   claim that we're bringing.  We're bringing what's known as

12   a pre-assault claim, which requires a showing that an

13   institution had a policy of deliberate indifference to

14   past sexual misconduct, that heightened the risk of sexual

15   misconduct at the institution which resulted in the

16   assaults that plaintiff (indiscernible) seek.

17          Now, this is precisely the type of claim for a

18   situation like the one that we have.  And in every --

19   every circuit that considered this type of claim has found

20   this to be a viable Title 9 theory, and it's completely

21   consistent with Debnor and Davis (ph), the leading Supreme

22   Court cases on this issue.

23          Now, for this type of claim the way that you

24   show it is that the institution was aware of series of

25   sexual misconducts, and essentially did nothing about it

1    or didn't act appropriately in response to it.

2          And in our complaint, we have alleged more than

3    just a nebulous culture of abuse, which is what the

4    defendants say.  We have shown at least seven lawsuits

5    since 1996, one yielding $50 million in punitive damages,

6    two exposes and uncovered (indiscernible) kids have been

7    abused.  This is not some, you know, nothing to the paper,

8    this is the Philadelphia Enquirer that uncovered scores of

9    abuse.

10          If it weren't enough to become known to the

11   facts of this case because they true are egregious, so we

12   have the exposes and there's the lawsuits.  And every

13   other circuit that has addressed this has found with that

14   type of information, one thing that (indiscernible) the

15   pleading stage on a pre-assault (indiscernible).

16          So we just want to be clear about two different

17   things in the context of a pre-assault claim.  One is that

18   in this case, we explicitly alleged educational detriment,

19   that the students were affected by what had happened.

20   Moreover, it's clearly severe enough to give rise to

21   educational detriment.

22          What we have here are not just allegations of

23   teasing or something like that, we have allegations of

24   sexual assault and rape.  So in addition to the case law

25   supporting the idea that this is sufficient under the law,

1   social science in the last 10, 15 years have made it

2   abundantly clear that chronic abuse can give rise to the

3   inability to learn.  We've alleged that in our complaint

4   as well.

5         And finally, all but one of the plaintiffs

6   allege that staff members abused them.  That's a critical

7   important difference in something that I believe the

8   defendants gloss over.

9         When someone in the position of authority abuses

10  another, the case law confirms that that's different than

11  care to cure abuse.  And Jester (ph) says it explicitly,

12  no one questions that a student suffers extraordinary harm

13  when subjected to sexual harassment and abuse by a

14  teacher.  And that the teacher's conduct is reprehensible

15  and undermines the basic purposes of the educational

16  system.  That's what we have here.  That's why a Title 9

17  claim is appropriate.

18        We have pled allegations that far exceed other

19  cases where they haven't found a pre-assault claim, and

20  further this is the tip of the iceberg.  This is what know

21  of publicly, that there are newspapers that are

22  (indiscernible) this.  There is so much more that we don't

23  know and that's why we need to go into discovery.

24        THE COURT:  Okay.  Thank you.  Mr. Lutsky, would

25  you like to argue against this?

```
 1              MR. LUTSKY:  Yes, Your Honor.

 2              THE COURT:  All right.  Would you like to argue

 3      in favor of your motion?

 4              MR. LUTSKY:  Thank you.  Let me first point out

 5      that there is no Title 9 case claim pled in Roe, it's pled

 6      in Jines, but it's not pled in Roe.

 7              THE COURT:  Is that right?

 8              MR. LUTSKY:  Yes.

 9              THE COURT:  Intentional infliction in Roe?

10              MR. LUTSKY:  There's no Title 9 case pled here?

11              THE COURT:  Oh, is that right?  Yes, because the

12      other you need it for jurisdiction.

13              MR. LUTSKY:  Right.

14              THE COURT:  Okay.

15              MR. LUTSKY:  So in fact, in Jines for several

16      reasons plaintiffs gives the only basis for subject matter

17      jurisdiction of this Court for three of them actually,

18      Jane Doe 6, John Doe 1 and 2 and Johns, if there's no

19      Title 9 claim if that's dismissed, there is no subject

20      matter jurisdiction.

21              THE COURT:  Well, there is on certain

22      plaintiffs.

23              MR. LUTSKY:  Yes, but not on those three.

24              THE COURT:  Okay.  I understand that, but the

25      issue is whether or not there's a Title 9 claim.
```

1          MR. LUTSKY:  Right.  So in Johns, on the Title 9

2    claim -- first, let me say that they've acknowledged they

3    can't state the traditional Title 9 claim because they

4    can't plead or prove that anyone at Deveraux had actual

5    notice of the propensity for abuse before the --

6          THE COURT:  Well, how about -- not only

7    intentional, how about reckless disregard?

8          MR. LUTSKY:  But that's not a Title 9 claim.

9          So with regard to Title 9, what they're arguing

10   now and this is what counsel just argued, they argued that

11   while they can't state a traditional Title 9 claim because

12   they don't have actual notice before the abuse occurred to

13   those plaintiffs, they find a state where they call pre-

14   assault claim.

15         And the pre-assault claim they're arguing is

16   that because of these -- what they claim to be lack of

17   policies or (indiscernible) of abuse, that they don't need

18   to show notice to Devereaux.

19         Now, let me say that the Third Circuit has not

20   adopted this pre-assault theory.  This (indiscernible)

21   case has to --

22         THE COURT:  But they haven't found anything -- I

23   mean, they -- we -- they've been silent on it, we don't

24   know what --

25         MR. LUTSKY:  Yes, it hasn't been tested in the

1      Third Circuit.

2               Now, a minority of courts have permitted this

3      pre-assault theory but still requires a showing of

4      deliberate indifference.  And here, you don't have facts

5      showing notice and deliberate indifference.

6               For example, the articles that she cited in the

7      newspaper, this was published in August of 2020.  These

8      claims in Jines, and that's the only case where there's a

9      Title 9 claim they go back 10, 20, 30, 40 years or more.

10     They're not notice of anything, the fact that there was a

11     case, you know, in 2018 or a case filed in 2020.  That's

12     not notice to Devereaux of an abuse issue that happened to

13     one of their plaintiffs they allege in 1976, in 2003, in

14     1994, 1987.  Those are after the fact instances, they're

15     not notice.

16               Secondly, even in the pre-assault theory

17     jurisdictions, you have to show that the abuse or

18     discrimination or harassment or whatever you want to call

19     it, had a severe impact, severe impact, it's a very high

20     bar when you say this, on their educational activities.

21               Now here, the only thing that's been pled is

22     that there was an impact on their educational activities,

23     but there are no facts pled about that at all, just a

24     conclusory statement.

25               And the cases cited by, and this is really

1    important, the cases cited by the plaintiff on this issue

2    that show that there's a presumption of a severe impact

3    when it's teacher on student abuse, they have no

4    application here at all.

5            None of these cases allege that a teacher abused

6    anybody, not one.  None of them.  What they allege is that

7    a staff member, these are people who are not part of the

8    educational program.  They are people who are in the

9    health and well being and a clinical and medical program

10   of Devereaux, they have nothing to do with the educational

11   program of Devereaux.

12           So all these teacher on student cases they rely

13   upon are completely irrelevant because the school has the

14   same teacher (indiscernible) where anybody can enter into

15   the educational progress.

16           So Devereaux takes care of not only an

17   educational need for these students, to the extent they

18   live there, and not everybody does.  Many -- and I don't

19   you don't want to talk about the class yet, but many of

20   the so-called members of the class don't live there.  But

21   Deveraux also primarily takes care of their medical,

22   psychological, behavioral needs through a psychiatrist,

23   clinicians, doctors, nurses, and that's where these staff

24   members work and that's what their function is, is to work

25   with them.  They're part of the health and well being

1    team, they're not part of the educational team.

2           So there's been no showing in this pleading that

3    their educational activities were disrupted.  Now, I know

4    that counsel talked about, you know, rape and abuse, but

5    in Roe, for example, we had a representative who claimed

6    that he was punished with loss of some food and someone

7    covered his eyes.

8           In some of the Jenix (ph) cases, some of them,

9    it's physical only and it's not sexual at all.  So here --

10          THE COURT:  You're arguing that it can't be

11   abusive enough so that it's --

12          MR. LUTSKY:  You have to plead what the specific

13   educational impact was, and that wasn't done here.  All

14   they said was anti (indiscernible) traditional activities.

15   But the courts in this area have basically said that even

16   severe mental distress, severe emotional distress does not

17   satisfy it.  It has to have a direct impact under

18   educational activities and there's disruption of those

19   activities.

20          I'm not saying it couldn't (indiscernible)

21   happen, there could be cases where it would, but I'm

22   saying it has not been pled.

23          THE COURT:  Okay.

24          MR. LUTSKY:  And because it hasn't been pled, it

25   should be dismissed because it doesn't satisfy the

1    elements of the Title 9 claim, even a pre-assault.

2              THE COURT:  Okay.  Thank you.

3              MS. MOLDOVAN:  Your Honor?

4              THE COURT:  Yes, you may respond.

5              MS. MOLDOVAN:  A couple of responses, Your

6    Honor.  First with respect to the teacher/student

7    distinction, the (indiscernible) have not cited a single

8    case whether the distinction between whether or not

9    someone is labeled a teacher versus someone labeled a

10   staff makes any difference in the Title context, but I

11   have not found one.

12             Whether someone -- the question is whether or

13   not the person is in the position of authority, and in

14   that case, Devereaux is covered.

15             The second case I want to mention is in terms of

16   -- when the Philadelphia Enquirer article came out, and

17   whether or not that put Devereaux on sufficient notice.

18   The Philadelphia Enquirer article that came out talks

19   about lawsuits going back to the '90s and '80s.  Devereaux

20   was on notice of those lawsuits I assume, because at least

21   one had a $50 million punitive damage award.

22             So to say that the Philadelphia Enquirer is the

23   only time that Devereaux could have gotten any sort of

24   notice is to ignore many of the facts alleged in the

25   complaint, as far to ignore the reality of what the

1   institution should know about or knows about and

2   (indiscernible) prove (indiscernible) in discovery.  But

3   the lawsuits go back to the '90s, at least the '90s, and

4   the Philadelphia Enquirer article mentions another expose

5   in 1985 about issues with Devereaux staff.  So that is far

6   before 2020.

7          In terms of the severity of the harm, a few

8   responses.  First, we have explicitly alleged that it was

9   severe.  Defendants may not believe that, but that's what

10  we have alleged.

11         Second, the idea that only -- that mental

12  anguish is not enough, defendants cite one case where the

13  Court found that mental anguish was not enough.  That is

14  not in keeping with the majority of case law, which has

15  found that mental anguish not only is enough, but

16  obviously is going to result in something as severe as a

17  rape or a sexual assault.

18         And again Your Honor is correct that Title 9

19  does not (indiscernible), it's only in the Johns context.

20  And so there are numerous cases where Courts have found

21  that the assault itself is what gives rise to the

22  educational detriment.

23         There's Doe C v The Career Tech Center, which is

24  from the Middle District of Pennsylvania and that involved

25  abuse of a student and they did not -- the Court did not

1    look for additional educational (indiscernible) beyond the

2    abuse.  NDB v (indiscernible) Christian School (ph) from

3    the Western District of Pennsylvania, a 9-year old was

4    sexually assaulted on a bus.  The Court didn't look for

5    further educational detriment.  So --

6         THE COURT:  The one thing I haven't -- okay, I

7    understand your argument there.  The -- I did not -- I

8    don't want to preclude you from arguing intentional

9    infliction of emotional distress in Roe that is now the

10   Title 9 claim.

11        MS. MOLDOVAN:  Certainly  I can address the

12   IIED.

13        THE COURT:  That's right.

14        MS. MOLDOVAN:  Yeah, in both cases.  All right.

15   So our argument for IIED is that by not implementing

16   policies to prevent abuse in the phase of repeated reports

17   of abuse of children with disabilities Devereaux's

18   comments were extreme and outrageous.

19        For IIED the type of abuse doesn't matter,

20   whether or not it was emotional and sexual or physical,

21   which is why it covers Roe, who alleges physical abuse.

22        So the first thing I'll say about the IIED claim

23   is we have to -- the law takes into account of the

24   victims.  Here we have kids with disabilities.  If there

25   is ever a case where IIED is appropriate, it's this case.

1    And we're not just talking about the underlying

2    harassment, it's the institutional betrayal aspect that

3    gives rise to the IIED.

4              These kids depended on the institution to keep

5    them safe.  So this is completely separate from the

6    perpetrators who actually abused the kids.  This is about

7    the institution's failure to respond to those kids and to

8    be deliberately indifferent.

9              So two things about that, the standard for IIED

10   is not really intentional infliction but also reckless

11   infliction.  That is the standard of Pennsylvania law,

12   Taylor v Albert Einstein, a 2000 Supreme Court in

13   Pennsylvania decision that (indiscernible).  The standard

14   was recklessness.

15             There are multiple cases that have found that

16   where an institution fails to investigate and fails to

17   follow-up on egregious harms the institution can be held

18   liable for IIED.

19             So when we talk about (indiscernible) which is

20   where the institution failed to follow up on reports on

21   allegations of abuse.  But there have been other cases

22   that have found institutions liable for IIED in

23   Pennsylvania.

24             So Doe v Moravian College is a 2021 case from

25   the Eastern District of Pennsylvania.  And it held that

1   the college's response to the rape of a student rised to

2   the level of IIED because leadership at the college

3   learned that two of its students raped another student and

4   the college took no action.  And in addition to taking no

5   action, the school discouraged the individual from coming

6   forward with a complaint.  And the Court found that that

7   would clearly survive a motion to dismiss an IIED claim.

8           The same was found was in NGJ v School District

9   of Philadelphia, also an Eastern District of Pennsylvania

10  case from 2017 again denying a motion to dismiss when the

11  institution failed to follow-up on severe allegations of

12  abuse.

13          That's precisely what we have in both

14  (indiscernible) Roe and the Jines case.

15          THE COURT:  Okay.  Okay.  Mr. Lutsky.

16          MR. LUTSKY:  Thank you, Your Honor, if I could

17  just finish up first on the Title 9 in response to --

18          THE COURT:  Oh, sure.

19          MR. LUTSKY:  -- counsel's argument.

20          THE COURT:  Of course.

21          MR. LUTSKY:  Title 9 is an educational statute.

22  So the question is not about whether the severe mental

23  anguish, we're not arguing that it creates severe mental

24  anguish we understand that.  The question is, does it have

25  a severe impact on your educational activities.  What is

1    the connection to education as opposed to the general well

2    being?

3              Noe one is arguing that they didn't allege

4    severe anguish.  But there are many cases that we've cited

5    in our briefs that hold if there's not a direct connection

6    pled, facts pled to their disruption of their educational

7    activities it's not a Title 9 thing.  It might be

8    something else, but it's not a Title 9 thing.  And that

9    was our Title 9 argument.

10             Now, with regard to IIED and negligent

11   infliction.  First I want to make clear we didn't seek to

12   dismiss the negligent infliction claim, so I'm not sure

13   why you're --

14             THE COURT:  So as of record, you're not moving -

15   -

16             MR. LUTSKY:  Not negligent, intentionally yes.

17             THE COURT:  Okay.

18             MR. LUTSKY:  Not negligent infliction.

19             THE COURT:  Is that --

20             MS. MOLDOVAN:  Your Honor, I'm only addressing

21   intentional infliction.

22             THE COURT:  Okay.

23             MR. LUTSKY:  All right.  I thought I heard

24   arguments about what we should have done and should not

25   have been --

1            THE COURT:  No.

2            MR. LUTSKY:  -- so that's why I thought they

3     were arguing negligent --

4            THE COURT:  No.

5            MR. LUTSKY:  -- and we're not challenging that.

6            But with intentional infliction it's very clear

7     from the cases that there has to be conduct of the

8     institution as distinguished from the abusers.  The

9     institution, which is outrageous, so outrageous that it

10    would commit a claim for intentional inflict of emotional

11    distress.

12           And contrary to counsel's argument we have cited

13    a number of cases which have held that claims like this

14    while they may state intentional infliction claims against

15    the abuser, they don't state them against the institution,

16    because you have to differentiate the conduct.

17           For example, in Doe v Allentown School District,

18    which is an Eastern District case cited in our case, 2007,

19    again case involving sexual harassment and assault.  The

20    Court said it is generally only the perpetrator is

21    considered liable for an intentional infliction claim.

22           The Court went on to say these results are not

23    surprising because the tort is designed to provide

24    compensation only for outrageous acts done for the purpose

25    of causing emotional distress.  And in the context of

1    sexual assault, typically the assailant alone intends the

2    harm and they dismissed the IIED claim against the school

3    district, the institution for the alleged assault by its

4    employee.  And that's what we have here.

5         We don't have outrageous conduct by the

6    institution.  We have outrageous conduct by the employee.

7    And the cases hold there's a very, very high bar for

8    outrageous conduct.  For example, there are cases that

9    even say (indiscernible) is not outrageous.  There are

10   plenty of cases we cited involving sexual harassment and

11   assault and battery that say the institution did not

12   commit outrageous conduct.

13        And they want to argue outrageousness by

14   omission again.  Not that we did something, but that we

15   should have done something.  And to me, that properly

16   falls into the negligent infliction claim which we're not

17   arguing.  They stated it, we'll defend it.  But it doesn't

18   fall into the intentional infliction of emotional distress

19   by (indiscernible).

20        THE COURT:  Okay.  Thank you.  Do you want to

21   respond?

22        MS. MOLDOVAN:  Yes, Your Honor.

23        THE COURT:  Mr. Lutsky, these are ones that I

24   propose that I get addressed in the -- in this oral

25   argument, but I will allow you to argue any other that you

1    can think would be helpful, but it's not important for you

2    to argue, I can go on the papers.  I mean, that's what

3    I've -- these are the things that I wanted to hear about.

4                MR. LUTSKY:  Sure.

5                THE COURT:  Okay.

6                MS. MOLDOVAN:  All right.  Two quick responses,

7    Your Honor.  First, we know that it's about the

8    institution.  We didn't even name the perpetrators.  So

9    our point is about holding the institution liable.  That

10   doesn't undercut our claim, that is our claim.  It's the

11   nature of our claim that the institution did not do what

12   it should have and did not do -- more than that, it was

13   reckless.

14               So the standard for IIED is one by extreme and

15   outrageous conduct intentionally or recklessly causes

16   severe emotional distress to another, is subject to

17   liability for such emotional distress and bodily harms are

18   results for such bodily harm.

19               So the standard under Pennsylvania law is

20   recklessness.  What Devereaux did was reckless.

21               THE COURT:  Okay.  I understand your argument.

22               MS. MOLDOVAN:  Thank you, Your Honor.

23               THE COURT:  Okay.  Is there anything -- I really

24   don't need argument on the others, on the individual ones.

25   Do you want -- do you --

 1          MR. LUTSKY:  No, I would like to be heard on the

 2  class action.

 3          THE COURT:  Okay.  The only -- I usually --

 4  that's such a wide -- I usually like to do that by a

 5  motion to certify or as opposed to -- there's no motion

 6  before me and I'm very reluctant to have you do that.  If

 7  you want -- if you insist on it, I will of course hear.

 8          MR. LUTSKY:  Could I explain why I think it's

 9  important in this case?

10          THE COURT:  Okay.  Sure.

11          MR. LUTSKY:  And --

12          THE COURT:  And are you ready -- prepared to --

13          MS. MOLDOVAN:  Yes, Your Honor.

14          THE COURT:  Okay.  All right.  You may go

15  forward.

16          MR. LUTSKY:  I'll try to shorten that argument

17  up (indiscernible) argument, you know, all right, so.

18          THE COURT:  Well, that's what I was thinking.

19          MR. LUTSKY:  All right.  But I will try to

20  shorten it up.

21          THE COURT:  Yeah, and I'll know more about the

22  case if I allow it to go through to discovery, so.

23          MR. LUTSKY:  I acknowledge, Your Honor, that it

24  is the exception and not the rule.

25          THE COURT:  Sure, in a motion to dismiss that's

1    exactly right.

2           MR. LUTSKY:  But there are cases in district

3    courts around the country including in Pennsylvania, both

4    Eastern and Western which have dismissed and struck class

5    action allegations even at the pleading stage.

6           THE COURT:  Are you really expecting to get that

7    from me?  You've been practicing law here.

8           MR. LUTSKY:  Well, let me explain why I think

9    it's appropriate here and maybe I'm fighting it, but I

10   don't feel bad about it.  I'd like to at least --

11          THE COURT:  Yeah, well, of course.

12          MR. LUTSKY:  The test is at the pleading stage

13   is there any amount of discovery that is going to enable

14   and to certify this class.

15          THE COURT:  Okay.

16          MR. LUTSKY:  In our view, there is no discovery,

17   no amount that would enable them to certify this class.

18   But failure to address it now will exponentially increase

19   the discovery in this case, because now they're talking

20   about Devereaux's entire organization, not just what

21   happened in a particular facility with Roe himself, one

22   facility.  We have 21 of them across the country in 13

23   states.  Now, we're talking about the entire country for

24   discovery and it will exponentially increase obviously the

25   cost of litigation for the parties, particularly for my

1    client, I mean, exponentially.

2              So we feel it is consistent with the federal

3    court philosophy of trying to create efficiency,

4    resolution of cases to look at this now and consider the

5    question at least, at least consider the question, is

6    there any discovery here that could permit this to be

7    certified under any circumstances.

8              And I'd like to tell you a few things why I

9    think it won't.  Number one, many circuit courts have

10   noted that Wal-Mart was a gamechanger in terms of

11   certifying class actions.  And Wal-Mart teaches us that

12   the district court has to perform a quote, rigorous

13   analysis of the claims and defenses and the elements of

14   the causes of action that are being offered to support

15   class action treatment.  Well, you can't do that here.

16             And the reason you can't do it here is because

17   the only count that is mentioned as a class action is

18   Count XI of the Roe complaint, which is a count and a

19   cause of action labeled injunctive and equitable relief.

20   And we have pointed out there is no cause of action, it is

21   a remedy, not a cause of action.

22             They have acknowledged that and said okay, but

23   then argued but all our other counts are incorporated by

24   reference anyway, so the entire complaint is being offered

25   as a basis for class action treatment.

1            The reason that's an absurd argument is, and

2    this gets back to what I said earlier, there's no actual

3    injury being pled in Roe for the class, none.  They make

4    it clear over and over again.  The injury is the

5    heightened risk of harm.  That's the injury.

6            Well, you have common law torts here.  For

7    example, assault and battery, intentional infliction of

8    emotional distress.  You cannot state those for heightened

9    risk of harm.  You need an actual battery, not a risk of

10   battery.  There's no such claim that I had risk of

11   battery.

12           You can have a battery if you were actually

13   battered, but you can't have a heightened claim of

14   battery.  The same with intentional infliction of

15   emotional distress, the same with negligence frankly in

16   Pennsylvania, the same with all the common law torts.

17           And let me say, Your Honor, they have not

18   identified a single case in all their briefing where a

19   class was certified based on common law torts.  And that's

20   what we have here.  We don't have a statute or a

21   constitutional mandate that is being argued that

22   objectively was violated.

23           They don't have a single case that they put

24   forth, we can't find one, where a class was certified just

25   based on common law torts.

1            THE COURT:  But it's not -- there's no

2    articulation that that would be precluded, is there?

3            MR. LUTSKY:  No.  But the reason it's not done

4    is because you can't make the elements of (indiscernible)

5    --

6            THE COURT:  Okay.  Okay.

7            MR. LUTSKY:  (indiscernible).  So for example,

8    the most important question for me in addressing -- and

9    I'll try to keep it shorter, in addressing certification

10   is, and this is the Wal-Mart's instruction.  When you look

11   at the causes of action that support class action

12   treatment as they pled, and we think it was only one count

13   and that's not even a cause of action, but when you look

14   at it, what you have to ask yourself is, is there a common

15   question whose answer, and the operative word there is

16   answer, whose answer will drive the litigation to

17   resolution.  That's the biggest issue in class action

18   certification.  We don't have that here.

19           What they've said is, everybody has a heightened

20   risk of injury because of either no policy or bad

21   influence in the policies.  That is not a common question

22   whose answer would drive the litigation.  And there are

23   cases we have cited, Stupenberg (ph) from the Fifth

24   Circuit, DL v The School District of the District of

25   Columbia which tried to do the same thing they're doing,

1    except not in torts, but through statute, all of those

2    cases allege there was systematic failures.

3             THE COURT:  Is that in the motion to dismiss

4    stage?

5             MR. LUTSKY:  Yes.  No.  It was done

6    (indiscernible).

7             THE COURT:  Yeah.

8             MR. LUTSKY:  But the principles are the same.

9    So if you have a case like this one where they're alleging

10   we have systematic failures, they don't identify a single

11   injunction that they're requesting.  They identify ten

12   subject areas for injunctions to be created presumably

13   through experts.  That's exactly what the Fifth Circuit in

14   Stupenberg said is completely contrary to Wal-Mart.  You

15   need a specific course of conduct and specific relief that

16   either all of the class gets or none of the class gets.

17   It has to be done in the same stroke.

18             You cannot have ten different subject matters

19   ranging from hiring to supervision to how we lay buildings

20   out, to video monitoring, to investigative responses, that

21   can never be certified as a class because it doesn't

22   follow along.  It doesn't follow with the United States

23   Supreme Court's decision that you have to have a specific

24   injunction from an answer to a common question which

25   resolves litigation and provides relief to all or provides

1    relief to none.

2           This is very much like what happened in the

3    Fifth Circuit in Stupenberg and the Gill (ph) case.  And

4    both of those cases completely rejected the idea of

5    certification.

6           Now, they do cite to the Baby Neal (ph) case in

7    the Third Circuit, that was (indiscernible).  In fact, it

8    was 20 years pre (indiscernible).  And it has very little

9    value today because before Wal-Mart and maybe Your Honor

10   will remember this, because I know you've been on the

11   bench a long time, before Wal-Mart it was not that

12   difficult to certify a class based on a common question.

13   But the Supreme Court completely changed that.

14          THE COURT:  But then the question is whether --

15   you know what my issue would have to be, whether I follow

16   the Third Circuit or the Supreme Court.  I know that's the

17   $64,000 question.

18          MR. LUTSKY:  I think all the circuits and all

19   the district justices have to follow the Supreme Court

20   (indiscernible).

21          THE COURT:  Well, no, but whether I -- that

22   would have to happen in the context of the Third Circuit,

23   but not in the context of the --

24          MR. LUTSKY:  Well, and I would suggest to Your

25   Honor respectfully if Baby Neal came up today, after Wal-

1    <u>Mart</u> decision --

2              THE COURT:  I --

3              MR. LUTSKY:  -- it would've been decided

4    completely differently.

5              THE COURT:  All right.  Okay.

6              MR. LUTSKY:  So you didn't have any single

7    question here that can certify a class, none.  And

8    especially when you wanted (indiscernible) common law

9    torts involving hundreds of thousands if (indiscernible)

10   you know at least 25,000 people who'd be in service today

11   by 7,000 different people, you are not going to find the

12   commonality that you need to certify a class.

13             And let me just say one more thing about this,

14   because I know Your Honor wants me to keep this quite

15   short.  This is a 23(b)(2) class, which is injunctive

16   relief only.  No claim here for monetary damages.  And

17   we've made an argument that Roe is not a typical plaintiff

18   because he's making a claim for money damages, but I'll

19   leave that to the (indiscernible).  I'll put that aside.

20             But in a 23(b)(2) class, there is no opt out

21   available to the class members.  They have no right to opt

22   out.  They are bound by the decision.  So if they get an

23   unfavorable result, it's too bad and they can't come

24   forward later with their claims.

25             And because of that, Courts take great care in

1    23(b)(2) cases particularly to make sure the class is

2    cohesive and the commonality requirements are even that

3    much more stringent in the 23(b)(2) as opposed to a

4    monetary 23(b)(3) case.

5           There is no discovery here that will ever take

6    place that will allow you to consider certifying a class.

7    The only result will be that we will spend hundreds of

8    thousands of dollars of wasteful discovery that will lead

9    to nothing.  And that's why I ask the Court to at least

10   consider the issue at the pleading stage, and cases in

11   this courthouse and in other federal courts of

12   Pennsylvania have done that.

13          Judge Winer (ph) did it here when he considered

14   the fact that in a discrimination case, it was never going

15   to be certified because they were saying people being

16   discriminated against for different reasons.  It's the

17   same thing here.  Are they getting a heightened risk of

18   abuse because the building is not properly laid out?  Is

19   it because the video system doesn't work right?  Is it

20   because you don't have a policy on supervision?  Is it

21   because you shouldn't have hired the person in the first

22   place?  This is not a class.  This is a super allegation

23   complaint.

24          THE COURT:  I assure you that I will consider

25   your very interesting argument.

1          MR. LUTSKY:  Thank you, Your Honor.

2          THE COURT:  Okay.  Ms. Martin?

3          MS. MARTIN:  Thank you, Your Honor.  I agree

4     with Your Honor this is premature just about --

5          THE COURT:  I didn't say I thought it was

6     premature.

7          MS. MARTIN:  I think this is premature.  I think

8     the back and forth that we had in our briefing and that

9     we're going to have right now just shows that there's a

10    lot of discussion --

11         THE COURT:  Well, his argument is that you will

12    have absolutely no opportunity to certify a class, that

13    there will be no -- there's no discovery that you can do

14    that -- because he talks about extensive discovery.  What

15    are you telling me the discovery might unveil that would

16    allow you to have a class certification?

17         MS. MARTIN:  Certainly, Your Honor.  What

18    policies did they have, what do they look like, how are

19    they enforced, how are they implemented.  Centralized

20    decision-making, who made the decisions, when they learned

21    about abuse that happened, what did they do, what were

22    their discussions, how did they decide whether to change

23    their policies or not.

24         All these things are infinitely learned in

25    discovery that will help us to answer the common questions

1    that we would love to brief on class certification, but

2    did they have a duty to protect those students in their

3    cases -- the (indiscernible) in their case.  Did they

4    protect duty?  And did outreach of the duty cause the

5    increased risk of abuse and assault to all of the current

6    class members.

7            We do have an actual injury here.  The injury is

8    a heightened risk of abuse above the baseline that is in

9    the public.  It's similar to the kind of heightened risk

10   that you see recognized as an actual current

11   (indiscernible) injury that you see in (indiscernible)

12   monitoring classes.  Where the defendant's wrongdoing,

13   those are tort cases as well, the defendant's wrongdoing

14   has created an increased risk of a disease or some other

15   kind of sickness, and that increased risk is a liability.

16   That is an actual harm that everyone is suffering.

17           And you can look at that, take that all the way

18   back, for example, Friends of All the Children versus

19   Lockheed where you had the children coming from Vietnam

20   and the plane lost pressure, and all those children were

21   then at an increased risk for follow-on illnesses and

22   injuries related to the severe loss of pressure that

23   happened when they were being evacuated from Vietnam.

24           Many other medical monitoring cases, that was

25   from the (indiscernible) court but moving forward to the

1   present day.  So that's an example of the kind of

2   situation where you have an increased risk.  Yes, it's a

3   risk, but this isn't a speculative fear of harm, this is

4   an actual increased risk that is measurable that affects

5   everybody that's there now, that that is avoidable.  And

6   that if they do implement reforms and we don't know what

7   those are yet, (indiscernible) but if they do implement

8   reforms, that increased risk over the baseline is you

9   can't eliminate it, and you can't fix that for everyone

10  across the board, one (indiscernible).

11          It's true that in our briefing we do have a

12  number of different options that we put in there that

13  could be things that we might need to be doing, to address

14  the issues.  The problem is we don't know exactly yet what

15  is wrong with their policies and their enforcement and

16  their decision-making.

17          All we know, Your Honor, is that something has

18  gone terribly wrong, because the abuse is rampant, it's

19  everywhere, it's normalized, it's baked into the culture.

20  So we need to find out in discovery what are the policies,

21  (indiscernible) the policies, how are they informed --

22  enforcing them, what's the (indiscernible) making with the

23  knowledge that they do have.  That's the kind of stuff

24  that will lead to the answers to the common question that

25  drive duty and breach and causation for the entire class

1     with regard to the injunctive relief claimed.

2             Certainly the damages is different but damages

3     is looking back.  What happened and how can we compensate

4     what happened in the past versus what is happening now and

5     how we prevent in the future.

6             And so that's the reason why the argument that

7     my colleague made about, at the very end there, about how

8     -- and its in his briefing as well, if there is a ruling

9     on injunctive relief that would somehow bind this class so

10    that they will be unable to bring damages claims in the

11    future, this has nothing to do with damage claims.

12            An injunctive relief ruling will not have

13    anything to do with their ability to bring damage claims

14    for past harm, this is talking about harm that is

15    affecting them right now as we sit here.  All the children

16    are in Devereaux's care are facing this increased risk

17    above the baseline right now, and this is about what we

18    can do to change that so they are not facing that risk.

19            THE COURT:  Okay.  Thank you.  Now, do you want

20    to respond?

21            MR. LUTSKY:  Briefly.

22            THE COURT:  Yeah, okay.  And I'll give you a

23    chance to answer.  One second.

24            Oh, yeah, okay.

25            MR. LUTSKY:  Your Honor --

1          THE COURT:  Oh, yeah, I'm going to have one more

2     issue, thank you.

3          MR. LUTSKY:  Thank you.  I want to respectfully

4     suggest that counsel just made my argument for me, that

5     this will never be a class no matter what happens in

6     discovery.  She said the common question to be answered is

7     did they have a duty, did they breach it.  That's not a

8     common question for class action certification.

9          Did they have a duty and did they breach it?

10    How did they breach it?  Did they have buildings with

11    blind spots?  Did they not have a video system that was

12    everywhere, did they not hire the right people, did they

13    not supervise the right people, did they not retain the

14    right people, did they not investigate appropriately.

15         She's making my argument.  This is not a case

16    for which discovery will ever be (indiscernible) certified

17    and common questions whose answer will resolve the class

18    ever.  And she's absolutely just made the argument I've

19    been arguing for the past ten minutes.

20         This is about 10 or 12 different subject

21    matters.  In fact, I was also (indiscernible) to hear they

22    even know what policies we have.  I mean, that to me

23    sounds like a fishing expedition and I'm not making any

24    personal argument on it.

25         But they don't even know what we have, they just

1    know that they have to get in there and look.  That's not

2    a class.  A class requires a common question and it

3    requires a specific injunction, not 10 to 12 subject

4    matters you want to then prep injunctions for later, which

5    are not cohesively tied together.  This is -- I don't know

6    how to say it any better than she just said.  It's never

7    going to be a class.

8           THE COURT:  Okay.  One second.  Do you want to -

9    - no, I want to speak with my law clerk a second.

10          (Pause)

11          THE COURT:  Okay.  All right.  One second.

12          (Pause)

13          THE COURT:  All right.  The one claim that I do

14   have -- that I had delineated in my own -- with my own

15   notes is the claim of the statute of limitations in Jines

16   and whether or not it's a susceptible to fraudulent

17   concealment.  Do you have -- are you prepared to argue

18   that?  Okay.  I'm going to allow the defense to tell me

19   why you think that -- I understand the facts of that

20   pretty clearly.  Okay.

21          MR. LUTSKY:  This is a claim that they -- this

22   is plaintiff time at statute --

23          THE COURT:  Yes.

24          MR. LUTSKY:  -- that we're talking about.  This

25   is a claim that arose I think they said between 19 --

```
 1                   THE COURT:  I have it Kahn and Jane Doe 4.
 2                   MR. LUTSKY:  Jane Doe 4 I believe --
 3                   MS. MARTIN:  Jane Doe was voluntarily dismissed.
 4                   THE COURT:  Oh was it, okay?
 5                   MR. LUTSKY:  We're just talking about Kahn.
 6                   THE COURT:  All right.  Okay.
 7                   MR. LUTSKY:  This is allegedly a claim of abuse
 8      about -- over medication not sexual abuse.
 9                   THE COURT:  Uh-huh.
10                   MR. LUTSKY:  Over medication in 1976 or
11      thereabouts.
12                   THE COURT:  Uh-huh.
13                   MR. LUTSKY:  As I recall the briefing.  So we're
14      talking about more than 45 years ago.  An individual who
15      actually fled the institution and escaped because he
16      wasn't happy with the way in which they were handling,
17      including this over medication allegation.
18                   This is not a case of tolling the statute of
19      limitations.  There are no acts which they have alleged to
20      a place within the statutory period.  This claim has been
21      time barred for probably 35 or so years.  There's no
22      recent acts that have been alleged, and there was no
23      reason for Mr. Kahn not to know what he believed he had
24      suffered for what he had received in medication from
25      Devereaux.
```

 1              I don't know if this is a repressed memory case,
 2     it didn't say that, I don't know if it's that, I don't
 3     know if it's a case where he claims, apparently he claims
 4     that once he read about their culture in the newspaper he
 5     now decides that what they did was abuse.  Before he
 6     didn't really know that, but when he hears about the
 7     newspaper he decides well, must have been abuse.
 8              I mean, this is a textbook claim of statute of
 9     limitations.  There's nothing that's happened within the
10     statutory period to keep it alive.
11              THE COURT:  Thank you.  What happened in the
12     statutory period that would keep it alive?
13              MS. MARTIN:  As far as Kahn knew what's
14     happening to him was treatment, it wasn't abuse.  If I
15     could use the (indiscernible) to a stupor, he did not
16     understand that that was abuse and he did not understand
17     that for many, many years, and he suffered as a result of
18     that drug use.
19              Now, a couple of things.  The first is that
20     fraudulent concealment exists where one is told that pain
21     was part of the normal healing process, that's directly
22     from the Third Circuit case Bellis v Beloff (ph) and
23     that's exactly what happened with Kahn.  He was told what
24     was happening to him was part of his treatment.
25              The fact that he ran away because he found it

1    unpleasant, doesn't mean that he was aware that he was

2    being abused, or that he had a cause of action.  With a

3    child who's going to get chemical therapy, it's likely

4    that that child would be suffering, would not like what

5    was happening to her, and might even run away trying to

6    escape the treatment.  That doesn't mean the treatment is

7    abuse.

8            So -- and in particular, in this, in the Eastern

9    District of Pennsylvania there was a case where the Court

10   found that fraudulent concealment applied where the

11   plaintiff's (indiscernible) disabilities were caused by

12   the drugs that were prescribed and administered to the

13   plaintiff by the defendant as part of the therapy which

14   the plaintiff proved was negligent.

15           So that the entity that prescribed the drugs

16   that said it's part of treatment, and then used that same

17   argument to say that the statute of limitations bars the

18   claim, the institution can't do that, that's fraud.  The

19   institution has lied to the individual and has made it

20   impossible for the individual to know exactly what

21   happened to him was abuse.

22           Now, in terms of what's happened in the time

23   period, my colleague is exactly right, until the expose

24   came out about Devereaux, my client did not know that what

25   had happened to him was abuse.  He thought it was

1   unpleasant treatment, he knew that there were effects of

2   it, but he didn't know that it was abuse.  And this case

3   is completely different than other cases like Rice where

4   the individual understood that what had happened to her

5   was abuse.  That's not this case.  They didn't understand

6   -- Kahn did not understand that he had been abused.

7         And another point that's in our complaint, Your

8   Honor, is that Kahn now knows that he is sterile.  And he

9   believes the fact that he's sterile and can't have

10  children is due to the rampant drugs that he was

11  prescribed at Devereaux and the aftereffects.  This is

12  something that Kahn couldn't have known until recently.

13        THE COURT:  Okay.

14        MR. LUTSKY:  I'd also like to point out that Mr.

15  Kahn was a resident in Pennsylvania and also I think in

16  Texas at times with Devereaux, and obviously the statute

17  of limitations, Your Honor, is a state law concept.  And

18  the Supreme Court of Pennsylvania addressed this very

19  issue this year in the Rice case where they denied the

20  plaintiff's argument that the statute was tolled because

21  he didn't know about his -- that his abuse was really

22  abuse until he read a grand jury report.

23        Similar to the argument that they're making here

24  that he didn't understand it was abuse until he read a

25  newspaper article about others, not about him, because

1    there was no mention of him in any of the newspaper

2    articles, but he read it about others.

3           And I think what this (indiscernible) of

4    Pennsylvania, which his the last word from the

5    Pennsylvania statute of limitations what they said here in

6    Rice is important.  They said because there was no

7    pleading, no facts pled that the plaintiff had made

8    reasonable efforts to inquire into his injuries, that the

9    judgment on the pleadings was warranted for the defendant.

10          There are no facts pled here that Mr. Kahn did

11   anything.  Now, he may have only recently realized he was

12   sterile.  He may believe it's from the drugs, although

13   it's not clear that they're alleging it was at all, but he

14   had lifelong injuries being alleged here.  He certainly

15   knew he was injured, in fact, he knew he was being

16   mistreated in his mind because he ran away.

17          But he's alleged lifelong injuries and there's

18   no facts pled, none, that he took any steps to inquire,

19   make a reasonable inquiry as to whether or not he had been

20   abused.  And the fact that you wake up one day and read a

21   newspaper article about what happened to other people

22   that's too late.  And that's exactly what happened in Rice

23   with the (indiscernible) and the Supreme Court of

24   Pennsylvania said that's insufficient.  And they did, as a

25   matter of law, grant judgment on the pleadings.

1               THE COURT:  Okay.

2               MS. MOLDOVAN:  If I may --

3               THE COURT:  Yes.

4               MS. MOLDOVAN:  -- (indiscernible) about Rice?

5               THE COURT:  Yes.

6               MS. MOLDOVAN:  If you look at Rice it's a

7    different situation.  Rice said that she wasn't aware that

8    other people were being abused.  She specifically said

9    that she was told by the Diocese that quote, this was an

10   isolated event.  Rice knew that she was being abused.

11   Rice did not know the extent of the cover-up of the abuse.

12   That's different from what we're arguing.

13              We're arguing that Kahn did not know that he was

14   being abused.  So this case is not the same thing as Rice.

15   And the other point I just want to make is that reasonable

16   diligence is required, but reasonable diligence takes into

17   account the plaintiff's mental disabilities.

18              So it's not your average person and whether or

19   not they try to understand.  Reasonable diligence has to

20   take into account who the person is and what that person

21   has gone through.

22              THE COURT:  Okay.

23              MS. MOLDOVAN:  Thank you, Your Honor.

24              MR. LUTSKY:  Just very briefly.  But what Rice

25   teaches us is you have to allege facts that show their

1    reasonable diligence and there are none here, there's

2    absolutely nothing in the complaint about that.  And

3    counsel made reference to --

4            THE COURT:  Statute of limitations is

5    affirmative defense.

6            MR. LUTSKY:  Yes, but as a matter of law it can

7    be granted when it's clear on the face of the complaint

8    that their claim is time barred.  It's (indiscernible).

9            THE COURT:  Yeah, okay.

10           MR. LUTSKY:  And there was none in Rice on the

11   judgment on the pleadings, not a --

12           THE COURT:  Well, judgment on the pleadings is a

13   little different.

14           MR. LUTSKY:  Well, it's a matter of law, it

15   wasn't a fact based inquiry.  It wasn't a summary judgment

16   motion.  It was done on the judgment on the pleadings, the

17   pleadings themselves.  I don't think that's very different

18   than 4(b)(6) motion.

19           But, you know, counsel has made reference well,

20   the day to, you know, there were cases in the '90s, cases

21   in the '80s and there was a Georgia case, apparently none

22   of this woke up Mr. Kahn.  The only thing that woke up Mr.

23   Kahn was a 2020 newspaper article of the Enquirer.  And

24   again, no facts are pled here to suggest he did anything

25   to try to determine if he had a claim.

```
 1                    THE COURT:  Okay.  Thank you very much.  Okay.
 2       Very interesting argument and I appreciate your coming.
 3       Do you --
 4                    MS. MARTIN:  Just briefly, one housekeeping,
 5       Your Honor.
 6                    THE COURT:  Yes, I have housekeeping too.
 7                    MS. MARTIN:  Okay.
 8                    THE COURT:  No, your housekeeping comes first.
 9                    MS. MARTIN:  Sorry, Your Honor.  So I just
10       wanted to let the Court know this was just to update the
11       Court, it's not (indiscernible) to Devereaux that
12       Devereaux released our plaintiff Roe from a Devereaux
13       facility on August 12th.  So he is no longer at the
14       Devereaux facility.  So I just wanted the Court to be
15       aware of that.
16                    THE COURT:  But he was at the time of the --
17                    MS. MARTIN:  Yes, Your Honor, he was there --
18                    THE COURT:  So you're talking about an
19       injunction.
20                    MR. LUTSKY:  Yes, that's the only -- that's the
21       request for a class cases is injunction and it's black
22       letter law, you can't (indiscernible) injunction you have
23       no standing if you're not there, so how does that go
24       forward?
25                    MS. MARTIN:  So, Your Honor, first of all
```

1    Devereaux's waived this argument by failing to include it
2    in any of their briefing.  They've known this, they
3    released him.  So they've lost their shot (indiscernible)
4    first of all.
5              Second of all, you know, from our standpoint it
6    doesn't make any difference to the classic situation of,
7    you know --
8              THE COURT:  So is it an injunction perspective?
9              MS. MARTIN:  Sure, yeah, but it's
10   (indiscernible) from the time of filing of the complaint
11   he was at Devereaux at the time of the filing of the
12   complaint.  This is a class situation of capable
13   repetition (indiscernible) if Devereaux wants to, they can
14   release every plaintiff that we have and just keep
15   releasing them, that's not a (indiscernible).
16             I'm happy to brief this, Your Honor, if they are
17   trying to make an argument on this right now.  I'm just
18   trying to inform the Court of something that they already
19   knew.
20             THE COURT:  Well, I think it's best, you have to
21   -- if you object to that, they've now informed you, which
22   you should have known in the first place, which I'm sure
23   you probably do.
24             MR. LUTSKY:  No, I didn't.  The first time I've
25   ever heard of this was right here.

```
 1                THE COURT:  Oh, okay, all right.  That this is
 2     not a valid claim now that he's released.
 3                MR. LUTSKY:  Not for a class.  You can't get an
 4     injunction if they're not there.
 5                THE COURT:  Okay.
 6                MR. LUTSKY:  I mean, I'll tell Your Honor that
 7     that's exactly the reason why the Jines case, which
 8     included a class when it started, the class was withdrawn
 9     because none of the reps is still there.  I mean, this is
10     black letter law.
11                THE COURT:  I don't rule from the bench even on
12     black letter law.
13                MR. LUTSKY:  We're happy to brief it.
14                THE COURT:  Okay.
15                MS. MARTIN:  Your Honor, (indiscernible) brief
16     it, I'd like to also be allowed to brief the waiver issue.
17                THE COURT:  Okay.  Of course, you can brief it.
18     Any response that he's going to present, you certainly can
19     brief.
20                MR. LUTSKY:  (indiscernible)
21                THE COURT:  Well, you'll have a date.  You're
22     now -- it's in your court, of course it's my court, but
23     it's in your court to -- you now know the information if
24     you believe that it should be dismissed, you have to --
25     you would have to be your motion.
```

```
1            MR. LUTSKY:  In light of the holidays --
2            THE COURT:  That's okay.  I'm not going to --
3      when you bring it up?
4            MR. LUTSKY:  Yes.
5            THE COURT:  If you don't bring it up in a
6      reasonable period then I will --
7            MR. LUTSKY:  Would the middle of January be a
8      fit?
9            THE COURT:  I have no problem with that.
10           MR. LUTSKY:  Would that be fit, the middle of
11     January?
12           MS. MARTIN:  Every single (indiscernible) for
13     response and reply?
14           MR. LUTSKY:  Sure.  Whatever you need.
15           MS. MARTIN:  Sure.
16           THE COURT:  Okay.  All right.  Thank you.
17           All right.  I'm -- I'll rule on the motions and
18     thank you for a very interesting oral argument.
19           MS. MARTIN:  Thank you, Your Honor.
20           MR. LUTSKY:  Thank you, Your Honor.
21           THE COURT:  Hold one second, off the record.
22     (Proceedings concluded at 12:09 p.m.)
23                         * * * * *
24
25
```

1                    C E R T I F I C A T I O N

2

3       I,  Sheila Orms, Court approved transcriber, certify that

4       the foregoing transcript is a correct transcript from the

5       official electronic sound recording of the proceedings in

6       the above-entitled matter.

7

8

9       _____        January 5, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25