**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RICHARD ROE W.M., et al., | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 21-2655 |
| | : | |
| THE DEVEREUX FOUNDATION (d/b/a | : | |
| DEVEREUX ADVANCED | : | |
| BEHAVIORAL HEALTH), et al., | : | |
| Defendants. | : | |

**January 12, 2023**                                                    **Anita B. Brody, J.**

<u>**MEMORANDUM**</u>

The Devereux Foundation and its staffing subsidiary QualityHealth Staffing, LLC (collectively "Devereux") operate residential facilities for children with psychiatric, behavioral, developmental, or intellectual disabilities. For decades, Devereux has allegedly failed to protect the children in its care, instead subjecting them to an environment rife with sexual and physical abuse at the hands of staff and residents. Plaintiffs, three current or former residents of Devereux facilities, seek damages and injunctive relief on behalf of themselves and a putative class of Devereux patients. Devereux now moves to dismiss or strike several portions of plaintiffs' First Amended Complaint ("FAC"). I have jurisdiction under 28 U.S.C. §§ 1331 and 1367.

**I.    BACKGROUND**

Devereux operates twenty-one facilities across the United States for children with psychiatric, behavioral, developmental, or intellectual disabilities. FAC (ECF 42) ¶ 19.[1] These

---

[1] All facts are taken from the First Amended Complaint ("FAC") unless otherwise noted. I treat the allegations in the FAC as true, as I am required to do at this stage of the proceedings. *See Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010) ("We must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint."); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977) ("The facial

1

facilities treat more than 25,000 children and young adults each year in residential and outpatient programs. *Id.* ¶¶ 19, 35. The children living in Devereux facilities require specialized care and are particularly vulnerable to abuse: "[y]outh with disabilities are easily targeted as they . . . are seen as less likely to report abuse, especially when the victim has limited communication abilities or cognitive impairments." *Id.* ¶ 42. Some have already suffered abuse or neglect by the time they arrive at a Devereux facility. *Id.* ¶¶ 36, 40. Devereux promotes its expertise in caring for children with these histories of trauma, claiming to create a safe "therapeutic environment" that "unlock[s] and nurture[s] human potential for people living with emotional, behavioral or cognitive differences." *Id.* ¶¶ 36-37, 50.

In August 2020, the *Philadelphia Inquirer* published an article that brought those claims into question. The article alleged that at least forty-one children as young as twelve have been sexually assaulted in the past twenty-five years by Devereux staff members. *Id.* ¶ 4. In the months since, at least thirteen additional people have claimed that they were abused while living at Devereux facilities. *Id.* ¶ 5.

These allegations paint a grim picture of an organization that, across multiple facilities and over many years, turned a blind eye to pervasive physical and sexual abuse. *See id.* ¶ 51 (listing allegations). "[M]any children have been abused at Devereux's facilities, and many of [those children] have been unable to report or otherwise find ways to protect themselves from continued abuse due to [Devereux's] practices and customs . . . ." *Id.* ¶ 38. Those who did report abuse "were disbelieved without adequate or proper investigation" and "suffered retaliation." *Id.* ¶ 39. Devereux "ha[s] been on notice" of these problems for years, but "failed to implement necessary and appropriate system-wide protocols and policies to ensure the safety of" residents. *Id.* ¶ 44.

_____

attack [on subject matter jurisdiction] does offer similar safeguards to the plaintiff: the court must consider the allegations of the complaint as true.").

Plaintiffs W.M., A.W., and T.S. are three of the children who have allegedly suffered under Devereux's care. W.M., an eight-year-old boy with autism spectrum disorder ("ASD"), lived in a Devereux facility in Florida between fall 2020 and August 2021. *Id.* ¶ 65. For most of that period, he was sexually abused by another resident, who would "sneak into [his] room and perform oral sex acts on him." *Id.* ¶ 72. Staff members at the facility "forcibly restrained W.M." and "taunted and manipulated him by withholding food." *Id.* ¶¶ 75-76. After more than nine months at the facility, he was discharged to his mother's care. *Id.* ¶ 65.

A.W. and T.S. still reside at Devereux facilities. A.W., a fourteen-year-old boy with behavioral difficulties, has lived in a Devereux facility in Pennsylvania since 2018. *Id.* ¶¶ 81-82. During his time at the facility, A.W. has been restrained by staff, leaving "bruises and scrapes across his body," including "a deep scratch across his hip and buttocks." *Id.* ¶¶ 83-84. On separate occasions, Devereux staff "punched him in the nose," and "hit [him] with keys." *Id.* ¶ 83. He also witnessed and reported "incidents of inappropriate behavior and grooming of other Devereux residents." *Id.* ¶ 87. T.S., a seventeen-year-old boy with behavioral difficulties, has lived in Devereux facilities in Colorado and Georgia since August 2020. *Id.* ¶¶ 90, 92, 100. He was inappropriately assigned to a treatment unit for children with ASD, a condition with which he has not been diagnosed. *Id.* ¶¶ 92-93. Devereux staff in the unit denied him food and forced him to wear dirty clothes for weeks. *Id.* ¶ 95. T.S. was also physically abused by both Devereux staff and other residents: a staff member "hit[] him" and "restrained [him] against a tree," and another resident "punched [him] repeatedly" while staff members watched. *Id.* ¶¶ 95-97.

The named plaintiffs bring this action on behalf of themselves and a class of Devereux patients. The members of the putative class are all "subjected to the unnecessary (and foreseeable) risk of physical, emotional, and sexual assault caused by Devereux's failure to have and/or enforce

proper policies and procedures for the prevention of, and proper response to, such abuse." *Id.* ¶ 31. They bring a variety of tort claims and a Title IX claim, and seek damages and injunctive relief.

## II.   DISCUSSION

Devereux now moves (1) to dismiss the FAC's request for injunctive relief for lack of Article III standing under Federal Rule of Civil Procedure 12(b)(1); (2) to dismiss Count XI of the FAC under Federal Rule of Civil Procedure 12(b)(6); and (3) to either dismiss or strike the FAC's class claims under Federal Rule of Civil Procedure 12(f) or 23. Def. Motion (ECF 50) at 1.[2] For the reasons explained below, I will deny the motion.

### A.   Article III Standing

Article III of the Constitution authorizes federal courts to hear "[c]ases" and "[c]ontroversies." U.S. Const. art. III, § 2, cl. 1. "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (internal quotation marks omitted). At bottom, the standing requirement forces plaintiffs "to sufficiently answer the question: 'What's it to you?'" *Id.* (quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 22 Suffolk U. L. Rev. 881, 882 (1983)). This requirement "prevents courts of law from undertaking tasks assigned to the political branches," *Lewis v. Casey*, 518 U.S. 343, 349 (1996), and ensures that they "do not adjudicate hypothetical or abstract disputes" or act as "roving commission[s]" free to "publicly opine on every legal question," *TransUnion*, 141 S. Ct. at 2203.

"It is the plaintiffs' burden, at the pleading stage, to establish standing," *Reilly v. Ceridian Corp.*, 664 F.3d 38, 41 (3d Cir. 2011), by "alleg[ing] facts that affirmatively and plausibly suggest that [they] ha[ve] standing to sue," *Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d

---

[2] Citations to page numbers in ECF documents use the ECF pagination, not the pagination in the original document.

Cir. 2016) (quoting *Amidax Trading Grp. v. SWIFT SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).[3]

Plaintiffs must meet this burden "for each type of relief sought." *Summers v. Earth Island Inst.*,

555 U.S. 488, 493 (2009). Here, Devereux challenges plaintiffs' standing to seek injunctive relief,

arguing that their alleged injuries are too "hypothetical" to meet the requirements of Article III.

Def. Mem. (ECF 50-1) at 14. Any future abuse plaintiffs may experience, Devereux argues, lies at

the end of a "long line of possible but ultimately speculative contingencies." *Id.* at 18. Plaintiffs

counter that their alleged injury is not "some generalized fear of . . . future abuse," but rather "the

substantially increased risk . . . of physical, sexual, and emotional abuse" that they already face

because "of Devereux's lack of adequate policies to prevent and respond to abuse." Pl. Mem. (ECF

51) at 19.

The Supreme Court has boiled down the standing inquiry into its three "irreducible"

elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff must have (1)

suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578

U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citing *Lujan*, 504 U.S. at 560-61). Because

plaintiffs have satisfied all three requirements,[4] Devereux's motion to dismiss the FAC's request

for injunctive relief will be denied.

---

[3] As noted above, *see supra* note 1, I "must accept [plaintiffs'] allegations as true," but may not credit "[c]onclusory assertions of fact and legal conclusions." *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016). Because Devereux makes a facial attack on the court's subject matter jurisdiction, Def. Mem. (ECF 50-1) at 11, I apply a standard that is analogous to the standard for resolving a Rule 12(b)(6) motion. *Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016); *see also Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) ("In reviewing a facial attack [on subject matter jurisdiction], the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.").

[4] Though this lawsuit is a class action, I must analyze whether the named plaintiffs—W.M., A.W., and T.S.—have standing. *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) ("The initial inquiry . . . is whether the lead plaintiff individually has standing, not whether or not other class members have standing."). Only one plaintiff needs to meet the standing requirements for the lawsuit to proceed. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *see also New Jersey Physicians, Inc. v. President of the United States*, 653 F.3d 234, 239 (3d Cir. 2011) ("Only one of the three named plaintiffs must establish standing . . . ."). Accordingly, I focus my standing analysis on A.W. and T.S., both of whom still reside in Devereux facilities.

### 1. Injury in Fact

To establish their standing to sue, plaintiffs must first show that they have suffered an injury in fact—meaning an injury that is "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560. At the motion to dismiss stage, "the [i]njury-in-fact element is not Mount Everest." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (internal quotation marks omitted). Under this "generous" standard, plaintiffs must only allege "some specific, identifiable trifle of injury." *Id.*; *see also Hassan v. City of New York*, 804 F.3d 277, 289 (3d Cir. 2015), *as amended* (Feb. 2, 2016) ("The burden is low . . . ."). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (cleaned up).

Before embarking on this analysis, it is worth clarifying the nature of the alleged injury. Plaintiffs' FAC claims that Devereux has "fail[ed] to implement and enforce necessary and appropriate policies, procedures, and protocols" to hire and retain suitable staff, FAC (ECF 42) ¶¶ 115, 123, supervise employees and residents, *id.* ¶ 134, and, most significantly, "prevent and properly respond to incidents of abuse," *id.* ¶ 104. These failures "continue[] to place [p]laintiffs"—two of whom still live in Devereux facilities—"at a heightened risk of abuse." *Id.* ¶¶ 105, 116, 124, 135, 146. For the reasons explained below, this alleged injury is sufficient to meet the constitutional minimum.

#### i. Concrete and Particularized

"[A]n injury in fact must be both concrete and particularized." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016), *as revised* (May 24, 2016). For an injury to be "concrete," it must "actually exist"—that is, it must be "real and not abstract." *Id.* (internal quotation marks omitted); *see also*

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (noting that "traditional tangible harms, such as physical harms and monetary harms" are concrete, as are certain intangible harms). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (internal quotation marks omitted). Plaintiffs easily meet these requirements.

Most challenges on concreteness and particularization grounds focus on amorphous harms that are either "bare procedural violation[s], divorced" from any real-world injury, *id.* at 341, or so vague and universal that they reflect "generalized grievances" like an "injury to the interest in seeing that the law is obeyed," *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998). The injury alleged here falls into neither of these categories. There is nothing abstract about the harm of being confined to an institutional environment with allegedly deficient hiring, retention, supervision, and incident response policies—policies that have, according to the FAC, caused plaintiffs to suffer repeated incidents of abuse and that by all accounts remain in place. *Cf. Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 154-55 (3d Cir. 2022) (finding that "physical harm" and "a risk of future harm . . . [that] is sufficiently imminent and substantial" meet the concreteness requirement) (cleaned up). The environment created by these allegedly deficient policies affects each of the plaintiffs individually: A.W. and T.S. live in different facilities, interact with different staff members and residents, and have different treatment needs.

Devereux halfheartedly argues that the injury alleged by plaintiffs is not concrete because "it aggregates disparate 'risks' across a highly differentiated population." Def. Reply (ECF 52) at 13. But that analysis misunderstands the concreteness and particularization inquiries in two ways. First, these inquiries focus on the named plaintiffs themselves—whether the alleged injury is concrete and particularized *with respect to each of them*—rather than the putative class. *See Winer Fam. Tr. v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007). Second, an injury does not become

"disparate" just because many people have experienced it. *See Spokeo*, 578 U.S. at 339 n.7 ("The victims' injuries from a mass tort, for example, are widely shared, to be sure, but each individual suffers a particularized harm."); *Hassan v. City of New York*, 804 F.3d 277, 291 (3d Cir. 2015), *as amended* (Feb. 2, 2016) ("[T]hat hundreds or thousands . . . of other persons may have suffered the same injury does not change the individualized nature of the asserted rights and interests at stake."). Because each Devereux resident—including the named plaintiffs—is harmed in his or her own way by the policies alleged in the FAC, and those harms are "real and not abstract," *Spokeo*, 578 U.S. at 340, the alleged injury is concrete and particularized.

### ii. Actual or Imminent

At the heart of the parties' dispute is the second requirement for an injury in fact: that the injury be "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). "That 'actual or imminent' is disjunctive is critical: it indicates that a plaintiff need not wait until he or she has *actually* sustained the feared harm in order to seek judicial redress, but can file suit when the risk of harm becomes imminent." *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152 (3d Cir. 2022); *see also Susan B. Anthony List*, 573 U.S. at 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'") (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401, 414 n.5 (2013)). At the same time, "[a]llegations of *possible* future injury simply aren't enough." *Bognet v. Sec'y of the Commonwealth of Pennsylvania*, 980 F.3d 336, 348 (3d Cir. 2020) (emphasis added) (internal quotation marks omitted), *cert. granted, judgment vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). Courts use this requirement to weed out the "some day" cases—those where plaintiffs raise a harm that may happen "some day" in the nebulous future—and "reduce the possibility of

deciding a case in which no injury would have occurred at all." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 & n.2 (1992).

The actuality or imminence requirement takes on outsize importance when, as here, plaintiffs seek injunctive relief. In such cases, plaintiffs may not rely only on past injuries— because the relief they seek is forward looking, they must show some ongoing or future injury. *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (holding that the plaintiff must show he is "likely to suffer future injury" to seek injunctive relief). The past harms catalogued in the FAC, standing alone, are not enough to establish standing for injunctive relief. Plaintiffs must plead some ongoing or future harm, and that harm must be actual or imminent.

Plaintiffs have met that burden here. As described above, they allege that Devereux's hiring, retention, supervision, and incident response policies place them in danger of abuse. FAC (ECF 42) ¶¶ 105, 116, 124, 135, 146. Whether framed as the ongoing harm of being confined to facilities with policies that fail to prevent or respond to abuse, or the likely future harm of continuing abuse because of these policies, this alleged injury satisfies the actuality or imminence requirement.

In a series of lawsuits seeking injunctive relief on behalf of children in foster care or other institutional settings, courts across the country—including in this district—have found that well-pled claims of past harm coupled with a policy, pattern, or practice that suggests those harms are likely to recur meet the actuality or imminence requirement. *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019) (finding that a foster child plaintiff has standing to seek an

injunction because "[s]he has presented evidence that she has not received adequate medical care or appropriate placements in the past as well as evidence that statewide policies and practices expose her to a risk of similar future harms"); *A. v. Nutter*, 737 F. Supp. 2d 341, 353 (E.D. Pa. 2010) (DuBois, J.) (holding that plaintiffs in the Philadelphia child welfare system have standing because they "allege future injury [that] is imminent because of a policy or custom either acquiesced in or authorized by the . . . [d]efendants"); *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 153 (D. Mass. 2011) (finding that foster children plaintiffs meet the actuality or imminence requirement because they "allege . . . that [the state foster care system] maintain[s] policies and practices that continue to harm them"); *Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 513 (D. Neb. 2007) (finding that foster children plaintiffs have standing "because [the defendant's] policies present a real and continuous threat that past harms from [the defendant's] actions or inactions will occur again"); *Clark K. v. Guinn*, No. 06-1068, 2007 WL 1435428, at *4 (D. Nev. May 14, 2007) ("The alleged systemic deficiencies in the [county and state] foster care system are similar to an injurious policy and . . . present[] a substantial likelihood that the alleged injury will occur."). The logic behind these decisions is simple: when a plaintiff is harmed because of a continuing practice, "it is significantly more likely that the injury will occur again." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003); *see also Doe 1 v. Michigan Dep't of Corr.*, No. 13-14356, 2014 WL 2207136, at *5 (E.D. Mich. May 28, 2014) (finding that a class of incarcerated children who alleged they were sexually abused upon their improper placement in adult prison cells had standing because their allegations raise "a realistic and non-speculative threat of future injury"); *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1138 (D. Haw. 2006) (finding that incarcerated children plaintiffs' allegations of future harm are "objectively reasonable in light of the repeated and persistent nature of the defendants' alleged . . . conduct"). That likelihood is

heightened when plaintiffs, like A.W. and T.S., are confined to an institutional environment and at the mercy of policies and practices set by others. *31 Foster Child.*, 329 F.3d at 1266 (noting that foster children plaintiffs "cannot avoid exposure to the [the state foster care system's] challenged conduct"); *Clark K.*, 2007 WL 1435428, at *4 (similar).

Devereux relies instead on a line of Supreme Court and Third Circuit cases finding that plaintiffs lack standing to seek injunctive relief when the future harm they allege is highly conjectural. *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013); *Reilly v. Ceridian Corp*, 664 F.3d 38 (3d Cir. 2011). This reliance is misplaced. Though these cases necessarily guide this court's standing inquiry, all three are distinguishable.

In *City of Los Angeles v. Lyons*, the Court held that a man who was injured by a police chokehold could not seek an injunction forbidding the Los Angeles Police Department from using chokeholds in the future because he had not shown that "he was likely to suffer future injury from the use of the chokeholds." 461 U.S. 95, 105 (1983). To have standing to seek an injunction, the plaintiff:

> "[W]ould have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner."

*Id.* at 105-06. Central to the Court's holding, then, were two conclusions: first, that the plaintiff, a citizen moving about the city in his day-to-day life, was unlikely to have another encounter with the police, even for a "traffic violation;" and second, that any such encounter was unlikely to result in police officers using a chokehold on the plaintiff again, absent some evidence of a broader policy or practice authorizing their use. *Id.* at 108.

Neither conclusion applies here. Plaintiffs A.W. and T.S. are confined to Devereux facilities and live constantly with the effects of its allegedly deficient policies. FAC (ECF 42)

¶¶ 81, 100; *cf. Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) ("Unlike *Lyons*, the plaintiffs in this case allege that they . . . are likely to suffer future [injury]."). And the FAC alleges that Devereux's policies and practices are to blame for plaintiffs' past injuries and likely to cause their recurrence. FAC (ECF 42) ¶¶ 104-105, 115-116, 123-124, 134-135; *cf. McBride v. Cahoone*, 820 F. Supp. 2d 623, 634 (E.D. Pa. 2011) (Davis, J.) ("Several courts have persuasively distinguished *Lyons* on the grounds . . . that a plaintiff has standing to pursue claims for injunctive and declaratory relief to combat a pattern of illicit behavior, particularly when the challenged conduct occurs pursuant to an officially authorized policy.").

Three decades after *Lyons*, the Court found similar deficiencies with plaintiffs' alleged injury—"a highly attenuated" causal chain separating present reality and future harm—in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). In that case, a group of American NGOs, media organizations, and lawyers sought to enjoin a statute authorizing government "surveillance targeting the communications of non-U.S. persons located abroad" without probable cause. *Id.* at 404. This surveillance, the plaintiffs argued, was likely to capture their communications because their work "requires them to engage in sensitive and sometimes privileged telephone and e-mail communications with colleagues, clients, sources, and other individuals located abroad," some of whom "are likely targets of surveillance." *Id.* at 406.

The Court held that the plaintiffs lacked standing because the harm they alleged was too hypothetical. Their alleged future injury:

> "[R]ests on [plaintiffs'] highly speculative fear that: (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under [the challenged statute] rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy [the challenged statute]'s many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of [plaintiffs'] contacts; and (5) [plaintiffs] will be parties to the

particular communications that the Government intercepts."

*Id.* at 410. The Court found that, at all five steps, plaintiffs' theory relied on speculation.[5] They "fail[ed] to offer any evidence that their communications have been monitored under" the challenged statute. *Id.* at 411. They had "no actual knowledge of the Government's . . . targeting practices"—a particularly damaging absence where the challenged statute "at most *authorizes*—but does not *mandate* or *direct*—the surveillance that [plaintiffs] fear." *Id.* at 411-12. And their theory "require[d] guesswork as to how independent decisionmakers"—both the government and the Foreign Intelligence Surveillance Court—"will exercise their judgment." *Id.* at 413.[6]

Despite Devereux's effort to style a causal chain as long as that in *Clapper*, Def. Mem. (ECF 50-1) at 18, plaintiffs' alleged injury is far less hypothetical. There is no doubt that A.W. and T.S. are the targets of the policies and practices alleged in the FAC—they live at Devereux facilities and are subject to the conditions those practices create. FAC (ECF 42) ¶¶ 81, 100. They also allege past, ongoing, and likely future harm attributable to Devereux's policies and practices, unlike plaintiffs in *Clapper*. *See Clapper*, 568 U.S. at 417 (discounting the plaintiffs' allegations of past surveillance because that surveillance "was conducted pursuant to . . . authority that predated" the challenged statute). And no third-party decisionmaker need act for the policies and practices alleged in the FAC to remain in place.

Similar problems plague Devereux's reliance on *Reilly v. Ceridian Corp.*, 664 F.3d 38 (3d Cir. 2011). In that case, employees sued their employer's payroll processing firm after a hack of the firm's computer system "potentially" exposed their names, Social Security numbers, and other

---

[5] Unlike this case, *Clapper* was decided at the summary judgment stage, where plaintiffs "can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (cleaned up).

[6] In addition, the *Clapper* Court noted that the standing requirements are rigorously applied in cases "when reaching the merits of the dispute would force [the judiciary] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," particularly when the dispute relates to "the fields of intelligence gathering and foreign affairs." *Id.* at 408-09. These concerns are not raised by the present case.

sensitive personal data. *Id.* at 40. The Third Circuit held that these employees lacked standing because no harm had taken place *and* no future harm was likely to occur. While a hacker had breached the payroll system, there was no indication that the hacker "(1) read, copied, and understood [plaintiffs'] personal information; (2) intends to commit future criminal acts by misusing the information; and (3) is able to use such information to the detriment of [plaintiffs] by making unauthorized transactions in [plaintiffs'] names." *Id.* at 42. Put simply, "no evidence suggests that the data has been—or will ever be—misused." *Id.* at 43. Indeed, there was "no evidence that the intrusion was intentional or malicious" at all. *Id.* at 44.

Here, in contrast, plaintiffs allege past and ongoing harm, not solely hypothetical future harm. *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 639 n.20 (3d Cir. 2017) (distinguishing *Reilly* because "the [p]laintiffs are not complaining solely of future injuries"); *Enslin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654, 664 (E.D. Pa. 2015) (Leeson, J.) (distinguishing *Reilly* and *Clapper* because "[p]laintiff's harms are not future harms, but ongoing, present, distinct, and palpable harms"). In addition, plaintiffs allege ongoing and future harm that is significantly more serious than data theft, consistent with the Third Circuit's observation that "[c]ourts resist strictly applying the 'actual injury' test when the future harm involves human suffering." *Reilly*, 664 F.3d at 45.

What all these cases ultimately teach is that, when considering whether an injury is actual or imminent, courts closely examine the connection between past, ongoing, and future harm; consider whether patterns, policies, or practices raise the likelihood of recurring injuries; and approach unmoored claims of harm in the indefinite future with skepticism. *See, e.g., Clemens v. ExecuPharm In*c., 48 F.4th 146, 153 (3d Cir. 2022) (applying context-specific factors, "with no single factor being dispositive," to determine whether an injury is imminent); *Roe v. Operation*

*Rescue*, 919 F.2d 857, 865 (3d Cir. 1990) (relying in part on the defendant's past actions to find that threatened future harm to plaintiffs "is both real and immediate"); *31 Foster Child. v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003) ("The alleged systemic deficiencies in the [state] foster care system are similar to an injurious policy, and different from the random act at issue in *Lyons*."); *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1138 (D. Haw. 2006) (finding an imminent injury because plaintiffs alleged that a prison "lacks the policies and procedures necessary to prevent . . . harassment, discrimination, and abuse" on a systemic level). All these distinctions relate back to the "implicit polic[y] embodied in Article III" that drives the entire standing inquiry to begin with: "assur[ing] that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982); *see also* John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1230 (1993) (arguing that the injury in fact requirement limits the judiciary to "its function of deciding a case or controversy, rather than fulfilling the *executive's* responsibility of taking care that the laws be faithfully executed").

This is not the sort of "some day," *Lujan*, 504 U.S. at 564, "debating society," *Valley Forge*, 454 U.S. at 472, claim that the "actual or imminent" requirement is designed to bar. Unlike former customers who may or may not patronize a particular business again, *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 224 (3d Cir. 2012), former employees who may or may not work for a particular employer again, *Fuentes v. Royal Dutch Shell PLC*, No. 18-5174, 2019 WL 7584654, at *2 (E.D. Pa. Nov. 25, 2019) (Brody, J.), or incarcerated people who may or may not apply for a commutation again, *Pennsylvania Prison Soc. v. Cortes*, 508 F.3d 156, 167 (3d Cir. 2007),

plaintiffs A.W. and T.S. continue to live in Devereux facilities. They continue to suffer from the systemic deficiencies in Devereux's hiring, retention, supervision, and incident response policies alleged in the FAC. They need not wait to be victimized further to seek forward-looking relief.

### 2. Causation

Having demonstrated a valid injury in fact, plaintiffs next "must establish that the defendant's challenged actions, and not the actions of some third party, caused the plaintiff[s'] injury." *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009). "Causation in the context of standing is not the same as proximate causation from tort law . . . ." *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 366 (3d Cir. 2014). The defendant's actions need not be "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). Instead, "an indirect causal relationship will suffice, so long as there is a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant." *Toll Bros.*, 555 F.3d at 142 (internal citation and quotation marks omitted); *see also Pitt News v. Fisher*, 215 F.3d 354, 360-61 (3d Cir. 2000) (applying "but for" causation to the standing analysis).

Plaintiffs clear this low bar. There is a "fairly traceable" connection between Devereux's actions and the injury alleged by plaintiffs. *See Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes."); *Aichele*, 757 F.3d at 366 ("[T]here is room for concurrent causation in the analysis of standing."). The FAC alleges policies and practices at Devereux facilities that place plaintiffs in danger of ongoing and future harm, FAC (ECF 42) ¶¶ 104, 115, 123, 134, even if they are not the only cause of that harm or the last link in the causal chain. *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1135 (D. Haw. 2006) ("Causation exists because the plaintiffs' injuries—pervasive youth-on-youth and staff-on-

youth . . . abuse—allegedly result directly from [the defendant]'s lack of adequate policies and procedures. The defendants run a secured youth facility, and they control and bear ultimate responsibility for the environment they create at that facility.").

Devereux argues that no causation exists because any future abuse would be perpetrated by third parties—its employees or other residents—and "all the policies in the world are unlikely to prevent harm from a non-party already willing to commit illegal acts." Def. Mem. (ECF 50-1) at 16 (emphasis omitted). But this argument misreads both the injury alleged in the FAC and the causation standard. As described above, plaintiffs' alleged injury is that they live in an environment with policies that expose them to an ongoing risk of abuse. Devereux's policies are one cause of that alleged injury, and it cannot avoid this fact by hiding behind the actions of third parties—third parties, it bears noting, who are hired and supervised by Devereux pursuant to the policies recounted in the FAC. FAC (ECF 42) ¶¶ 115, 123, 134. Further, "[p]laintiffs need not prove with specificity at this stage how every harm suffered by every named [p]laintiff relates to a particular defect in the system." *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 152 (D. Mass. 2011). It suffices to show that Devereux's actions (or inactions) are *a* cause of the injury alleged. *A. v. Nutter*, 737 F. Supp. 2d 341, 357 (E.D. Pa. 2010) (DuBois, J.) (finding that the causation element was satisfied because the "[c]omplaint sufficiently avers that [the] policies or customs of [the] [d]efendants—including a failure to . . . investigate reports of abuse and neglect . . . resulted in actual or imminent injury to plaintiffs"); *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019) (finding causation where the plaintiff alleged that "deficient . . . policies and practices" led to her injuries); *Ashley W. v. Holcomb*, No. 19-129, 2021 WL 5121146, at *2 (S.D. Ind. Sept. 29, 2021) (finding causation where plaintiffs "allege[d that] [d]efendants ignored widespread and systematic deficiencies within the foster care system").

Plaintiffs have done so here.

### 3. Redressability

Plaintiffs must finally establish that a favorable decision from the court is likely to redress their alleged injury. "In order for an injury to be redressable, a plaintiff must show that she 'personally would benefit in a tangible way from the court's intervention.'" *Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist*., 832 F.3d 469, 482 (3d Cir. 2016) (Smith, J., concurring) (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("It must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (internal quotation marks omitted). The redressability and causation inquiries are "closely related," because an injury caused by the defendant is likely to be redressed by a judgment against them. *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc*., 913 F.2d 64, 73 (3d Cir. 1990). "The difference is that while traceability looks backward (did the defendants cause the harm?), redressability looks forward (will a favorable decision alleviate the harm?)." *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009).

Here, plaintiffs seek "injunctive relief requiring Devereux, at a minimum, to implement and enforce policies and practices to prevent future incidents of abuse." FAC (ECF 42) at 52. These policies might include revised protocols for hiring, screening, and staff-resident interaction; improved trainings; increased monitoring of residents, particularly "during the most vulnerable nighttime windows;" and revamped procedures for responding to abuse allegations. *Id.* at 52-53. Devereux argues that this proposed relief would not redress plaintiffs' injuries because plaintiffs "cannot allege facts connecting their individual experience (and individual risk) as . . . Devereux resident[s] to the sprawling injunctive relief they seek." Def. Reply (ECF 52) at 17.

This argument again misunderstands both plaintiffs' burden at this stage of the proceedings and the redressability requirement itself. "Redressability is not a demand for mathematical certainty," *Toll Bros.*, 555 F.3d at 143, and all plaintiffs need to demonstrate is that, based on the allegations in the FAC, it is "likely" rather than "merely speculative" that a court's remedy would redress their injury, *Lujan*, 504 U.S. at 561. Unlike cases where judicial relief would merely offer plaintiffs "psychic satisfaction" or vindicate their "generalized interest in deterrence," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107-09 (1998), the injunction proposed by plaintiffs would change the systemic conditions that place them in danger of abuse. *See Massachusetts v. EPA*, 549 U.S. 497, 526 (2007) (finding redressability because the "risk [alleged by plaintiffs] would be reduced to some extent if [plaintiffs] received the relief they seek"); *Steel Co.*, 523 U.S. at 108 ("If [plaintiff] had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy that alleged harm."); *A. v. Nutter*, 737 F. Supp. 2d 341, 358 (E.D. Pa. 2010) (DuBois, J.) (finding that plaintiffs' injuries are redressable because "plaintiffs seek an injunction that" would force the defendants to change their policies); *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019) ("If . . . allegedly deficient policies and practices are abated by an injunction, that harm may be redressed by a favorable court decision."). That is enough to establish redressability—and by extension enough to meet all three requirements for Article III standing. Devereux's motion to dismiss the FAC's request for injunctive relief under Federal Rule of Civil Procedure 12(b)(1) will therefore be denied.

**B.  Title IX Claim**

Devereux next moves to dismiss plaintiffs' Title IX claim (Count XI of the FAC) because plaintiffs impermissibly seek emotional distress and punitive damages. Def. Motion (ECF 50) at 1; Def. Mem. (ECF 50-1) at 19. Devereux argues that "[p]laintiffs cannot plausibly allege a right

to relief that is legally unavailable, [so] they fail to state a claim under Title IX." *Id.* at 21 (internal quotation marks omitted). Because referencing the wrong remedy is not grounds for dismissal of an entire claim, the motion will be denied.

Devereux is right that the Supreme Court has foreclosed punitive and emotional distress damages in Title IX claims. *Barnes v. Gorman*, 536 U.S. 181, 186-87 (2002) (punitive damages); *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1572 (2022) (emotional distress damages). But other remedies—compensatory damages and injunctive relief—are available, as Devereux concedes. Def. Mem. (ECF 50-1) at 20; *Barnes*, 536 U.S. at 187 ("[W]e have held that under Title IX . . . a recipient of federal funds is nevertheless subject to suit for compensatory damages and injunction, forms of relief traditionally available in suits for breach of contract.") (internal citations omitted).

That these other forms of relief are available is dispositive. To survive a motion to dismiss, "it need not appear that the plaintiff can obtain the particular relief prayed for in the complaint, as long as the district judge can ascertain from what has been alleged that *some* relief may be granted by the court." 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed.) (emphasis added); *Dotschay for Use & Benefit of Alfonso v. Nat'l Mut. Ins. Co. of D.C.*, 246 F.2d 221, 223 (5th Cir. 1957) (noting that a complaint "is sufficient if it shows that the plaintiff is entitled to any relief which the court can grant, regardless of whether it asks for the proper relief"); *Popovice v. Milides*, 11 F. Supp. 2d 638, 641 (E.D. Pa. 1998) (Joyner, J.) ("The court's inquiry is directed to . . . whether the plaintiff has a right to *any* relief based upon the facts pled.") (emphasis added); *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 353 (E.D.N.Y. 2007) ("[A] motion for failure to state a claim properly addresses the cause of action alleged, not the remedy sought."). This is because "[a] pleading is a vehicle to facilitate a proper decision on

the merits and not a game of skill in which one misstep by counsel may be decisive." *Bechtel v. Robinson*, 886 F.2d 644, 649 n.9 (3d Cir. 1989) (cleaned up).[7] Devereux's motion to dismiss the Title IX claim will therefore be denied.

### C. Class Claims

Finally, Devereux moves to dismiss or strike plaintiffs' Rule 23(b)(2) class claims from the FAC. Def. Motion (ECF 50) at 1. While Rule 23 is "is silent about" when courts should dispose of class claims, Devereux argues that striking these claims now "is in keeping with . . . the Rule's practical, case-specific approach to resolution of class status." Def. Mem. (ECF 50-1) at 13. Because this motion is premature, it will be denied.

Whether plaintiffs meet the requirements of Rule 23 is typically decided on a motion for class certification. *Martin v. Ford Motor Co.*, 765 F. Supp. 2d 673, 680 (E.D. Pa. 2011) (Slomsky, J.) ("[C]ourts within the Third Circuit have . . . [found] a motion to strike class allegations premature where a motion for class certification has not been made and denied."); *P.V. ex rel. Valentin v. Sch. Dist. of Philadelphia*, No. 11-4027, 2011 WL 5127850, at *3 (E.D. Pa. Oct. 31, 2011) (Davis, J.) ("[I]n general, a court should wait to resolve a motion to strike class allegations until someone moves for class certification."). Courts only depart from this general rule in the rare cases where "class treatment is evidently inappropriate from the face of the complaint." *Zarichny*

---

[7] It is telling that the cases Devereux cites did not dismiss a claim under Rule 12(b)(6), but rather struck parts of a prayer for relief under Rule 12(f). *See Dodson v. Coatesville Hosp. Corp.*, No. 16-5857, 2017 WL 2798560, at *3 (E.D. Pa. June 28, 2017) (Baylson, J.), *aff'd*, 773 F. App'x 78 (3d Cir. 2019); *see also Siko v. Kassab, Archbold & O'Brien, LLP*, No. 98-402, 1998 WL 464900, at *6 (E.D. Pa. Aug. 5, 1998) (Green, J.) ("While motions to strike are not favored, they are proper if the prayer for relief asserted is unavailable under the applicable law or in excess of the maximum recovery permitted by law."); *Medevac MidAtlantic, LLC v. Keystone Mercy Health Plan*, 817 F. Supp. 2d 515, 534 (E.D. Pa. 2011) (Rufe, J.) (granting the defendant's request to strike plaintiff's "request for attorneys' fees and costs" because they "are not recoverable under the causes of action [p]laintiff pleads"). In a similar vein, the district court in *Cummings* only granted the motion to dismiss after it found that "the *only* compensable injuries that [the plaintiff] alleged [the defendant] caused were humiliation, frustration, and emotional distress"—injuries for which damages were unavailable. *Cummings v. Premier Rehab, PLLC*, No. 18-649, 2019 WL 227411, at *4 (N.D. Tex. Jan. 16, 2019) (emphasis added) (internal quotation marks omitted).

*v. Complete Payment Recovery Servs., Inc*., 80 F. Supp. 3d 610, 615 (E.D. Pa. 2015) (Dalzell, J.).

There is good reason for this practice. As the Third Circuit has repeatedly cautioned, district courts must perform a "rigorous analysis" when deciding whether a putative class meets the Rule 23 requirements. *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 318 (3d Cir. 2008), *as amended* (Jan. 16, 2009). This analysis often requires "some level of discovery." *Landsman & Funk PC v. Skinder-Strauss Assocs*., 640 F.3d 72, 93 (3d Cir. 2011), *opinion reinstated in part*, No. 09-3105, 2012 WL 2052685 (3d Cir. Apr. 17, 2012). It is no surprise, then, that almost all the cases Devereux cites were decided on a motion for class certification. *See* Def. Mem. (ECF 50-1) at 22-23.

This court declines to stray from the general practice in this circuit based on a few short pages of briefing, particularly when the parties vigorously dispute the validity of plaintiffs' class claims. *Korman v. Walking Co*., 503 F. Supp. 2d 755, 763 (E.D. Pa. 2007) (Robreno, J.) ("There is no good reason for this case not to proceed down the normal path, i.e., with . . . the parties litigating the propriety of maintaining the action as a class under the traditional Rule 23[] rubric."); *Richardson v. Verde Energy USA, Inc*., 354 F. Supp. 3d 639, 654 (E.D. Pa. 2018) (Beetlestone, J.) (finding that striking class allegations before a motion for class certification is premature where there "is a disputed and substantial question of law") (cleaned up). Devereux's motion to strike the Rule 23(b)(2) class claims will therefore be denied.

## III.   CONCLUSION

For the reasons discussed above, Devereux's motion to dismiss will be denied. An appropriate order follows.

　　　　　　　　　　s/ANITA B. BRODY, J.　　　　　　
　　　　　　　　　　ANITA B. BRODY, J.